[No. 15556.   Department One.   December 15, 1919.]

CONCESSIONS COMPANY, *Appellant*, v. THOMAS N. MORRIS
et al., *Respondents*.[1]

TAXATION (2)—PROPERTY OF UNITED STATES—BUILDINGS AND FIX-
TURES ON MILITARY RESERVATION.  Buildings erected and fixtures at-
tached by a licensee at Camp Lewis under a contract with the com-
mandant that they were to remain in case the licensee left the
premises, belong to the United States and are not subject to tax-
ation, in view of U. S. Const., art. 1, § 8, cl. 17, giving Congress
exclusive legislation over places purchased for forts and other
needful buildings by consent of state legislatures, and Rem. Code,
§ 6853, and Laws of 1917, pp. 2, 15, consenting to the acquisition of
lands for military purposes and to the donation of Camp Lewis
for a military reservation, and Rem. Code, § 9098, exempting from
taxation all property of the United States.

SAME (21)—SITUS OF PROPERTY—PERSONAL PROPERTY IN MILITARY
RESERVATION.  Personal property on the Camp Lewis military res-
ervation is not *in* but is *without* the state of Washington, within
the meaning of Rem. Code, § 9101, providing for the taxation of
personal property "in" the state of Washington; and is therefore
not subject to state taxation.

UNITED STATES (1)—JURISDICTION—PROPERTY CEDED FOR MILITARY
RESERVATION—CONDITIONS.  The provision for the issuance of civil
and criminal process from state courts over all tracts embraced in
Camp Lewis (Laws of 1917, p. 14, § 20), does not make the absolute
cession of exclusive jurisdiction to the Federal government con-
tained in said act a conditional cession and is not inconsistent with
the uses for which the property was acquired.

SAME.  The cession of jurisdiction to the Federal government
of Camp Lewis which was acquired by donation, rather than by
purchase within U. S. Const., art. 1, § 8, may be accompanied by
such conditions as the state may see fit to annex, if not incon-
sistent with the use for which the property was acquired; and the
Federal government acquired such jurisdiction as was ceded.

Appeal from a judgment of the superior court for
Pierce county, Fletcher, J., entered May 27, 1919, upon
sustaining a demurrer to the complaint, dismissing an
action to enjoin the collection of a tax.   Reversed.

[1]Reported in 186 Pac. 655.

*Revelle & Revelle,* for appellant.

*William D. Askren, Frank D. Nash,* and *J. A. Sorley,* for respondents.

MACKINTOSH, J.—The superior court sustained the respondents' demurrer to appellant's complaint, which, in substance, alleged that the appellant is a Washington corporation, with its principal place of business in Seattle, King county, and that the respondents are the county of Pierce and its assessor, treasurer, and sheriff. The appellant has a concession to operate barber shops at Green Park, which is a portion of the Federal army post known as Camp Lewis. This concession was granted by the Camp Lewis Amusement Company, which holds a license and authority from the commanding officer at Camp Lewis, and, by the terms of the concession, the appellant had the right to construct and operate buildings according to plans and specifications approved by the commanding officer, and to pay said commanding officer a location fee and a privilege tax of ten per cent of the daily gross receipts of the concession; the concession further providing that all rights under it might be terminated by the commanding officer for breach of its terms or for military reasons; that the appellant should submit to the commanding officer's auditor its records and accounts, and should abide by the tariffs, charges, rates, prices and rules which the commanding officer may make from time to time. It was further provided that, if the appellant failed to operate the concession for five days, the commanding officer could command the appellant to vacate and, upon such order, the appellant would have seven days to take from the buildings his personal property, and during those seven days the appellant might sell the buildings to any one else holding a concession approved by the

commanding officer. If no such sale was made, the appellant's rights in the buildings terminated. The concession could not be assigned without the commanding officer's consent. The complaint then alleges that the appellant erected the buildings on the military reservation as provided in the contract; that the reservation is the property of the United States; that the buildings could not be removed therefrom; and that the appellant had only the right of use and occupation; that, in the buildings, the plaintiff had located personal property which is not within the jurisdiction of Pierce county or the state of Washington, but in the exclusive jurisdiction of the United States government. It is then alleged that the respondents assessed the buildings, fixtures and personal property for taxes for the year 1918, and that the officials of Pierce county are threatening to sell this property to collect the tax. The complaint then prays for an injunction against Pierce county and its officers, and asks that the assessments be cancelled of record. The respondents, by demurring, admit the appellant's allegation that the title to the reservation is in the Federal government, and that, therefore, the provisions of the act of 1917, hereinafter referred to, relating to the acquisition of such title, have been complied with.

This appeal presents for the determination of this court the question as to whether or not property interests of the appellant, located on the military reservation at Camp Lewis, are subject to taxation by the state as a part of the property within the state; the appellant claiming that this property, being situated on a military reservation, is within the jurisdiction of the United States, and not within the jurisdiction of the state of Washington or Pierce county.

The constitution of the United States, article 1, § 8, provides that:

"Congress shall have the power to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over *all places purchased by the consent* of the legislature of the state in which the same shall be for the erection of forts, magazines, arsenals, dockyards and other needful buildings."

The state of Washington, by § 6853, Rem. Code, consented to the acquisition by the United States of lands for military purposes, this act being in harmony with the Federal constitutional provision above quoted, and the act providing that:

"The jurisdiction of this state is hereby ceded to the United States of America over all such land or lands as may have been or may be hereafter *acquired by purchase or condemnation, or set apart by the general government* for any or either of the purposes before mentioned: Provided, that this state shall retain concurrent jurisdiction with the United States in and over all tracts so acquired or set apart as aforesaid, so far as that all civil and criminal process that may issue under the authority of this state against any person or persons charged with crimes committed, or for any cause of action or suit accruing without the bounds of any such tract, may be executed therein, in the same manner and with like effect as though this assent and cession had not been granted."

And in the following section, being § 6854, the legislature provided:

"The tracts, pieces or parcels of land so acquired or set apart, together with the tenements and appurtenances for the purposes before mentioned, shall be held exempt from taxation by the state of Washington."

The legislature in 1917, in chapter 3, and chapter 4, was dealing particularly with the Camp Lewis Reser-

vation, and in those chapters consented to the acquisition and granted exclusive jurisdiction to the Congress of the United States of the territory donated for a military reservation; § 20, ch. 3, being as follows:

"Pursuant to the Constitution and Laws of the United States, and especially to paragraph seventeen of section eight of article one of such constitution, the *consent* of the legislature of the State of Washington is hereby given to the United States to acquire, by *donation* from Pierce county, title to all lands herein intended to be referred to . . . and the consent of the State of Washington is hereby given to the exercise by the Congress of the United States of exclusive legislation in all cases whatsoever over such tracts or parcels of land so conveyed to it . . . provided, that all civil process issued from the courts of this state and such criminal process as may issue under the authority of this state, against any person charged with crime in cases arising outside of said reservation, may be served and executed thereon in the same mode and manner and by the same officers as if the consent herein given had not been made." Laws 1917, p. 14, § 20.

The state of Washington and its subsidiary municipalities have no right to assess and tax the lands, buildings and fixtures situated within the military reservation which are the property of the United States government, and it cannot be disputed that so much of such property as has been attempted by the respondents to be assessed against the appellant has been assessed wrongfully; under the contract, the buildings and fixtures being the property of the government and not of the appellant. The contract clearly provides that the buildings are to be of a permanent nature and to remain where constructed, and the contract especially provides against their removal by the appellant, whose only right was to their use and occupation, subject to the power of the commanding officer

to terminate that right at any time for military reasons. That right is also terminated by the cessation of the use by the appellant. Therefore, by express agreement in the contract, as well as by the common-law principle governing the construction of buildings upon lands of another and the attachment of fixtures thereto, the buildings and fixtures used by the appellant are the property of the United States. The Laws of 1915, ch. 131, p. 358 (Rem. Code, § 9098), expressly provide that "all property, whether real or personal, belonging exclusively . . . to the United States" shall be exempt from taxation. There then only remains a question of whether the appellant's personal property situated upon the reservation is subject to state and county assessment and taxation.

Under our law, Rem. Code, § 9101, only personal property *in* the state of Washington can be listed for taxation, and the question, therefore, must be answered by a determination of whether personal property situated upon this military reservation is *in* the state of Washington. It seems to us that the answer to this is clear, and that such property is *without* the state in both a jurisdictional and territorial sense, for, as we have seen by the constitution of the United States, and the act of the legislature of this state, both the military reservation itself and the jurisdiction and legislation over it have been granted to the United States, and thereby there has been created an independent sovereignty the territory of which is surrounded by the state of Washington, but over which the state of Washington has no jurisdiction. A territory has been created which resembles that of the District of Columbia, the only reservation being that the state of Washington can serve civil and criminal process therein on actions arising outside the reservation.

The supreme court of Massachusetts, in *Commonwealth v. Clary,* 8 Mass. 72, had before it the question of jurisdiction over the lands in Springfield *purchased* by the United States for the purpose of erecting an arsenal *by consent of the state,* and that court, through its chief justice, said:

"On facts agreed upon in this case we are of the opinion, that the territory on which the offence charged is agreed to have been committed, is the territory of the United States, over which the Congress have the exclusive power of legislation. The assent of the commonwealth to the purchase of this territory by the United States, had this condition annexed to it—that civil and criminal process might be served therein by the officers of the commonwealth. This condition was made with a view to prevent the territory from becoming a sanctuary for debtors and criminals; and from the subsequent assent of the United States to the said condition, evidenced by their making the purchase, it results that the officers of the commonwealth, in executing such process, act under the authority of the United States. No offences committed within that territory are committed against the laws of this commonwealth, nor can such offences be punishable by the courts of the commonwealth, unless the Congress of the United States should give to the said courts jurisdiction thereof.

"As a consequence of these positions, it is the opinion of the Court, that they have no cognizance of the offences charged in this indictment, and that the defendant must be discharged.

"An objection occurred to the minds of some members of the Court, that if the laws of the commonwealth have no force within this territory, the inhabitants thereof cannot exercise any civil or political privileges, under the laws of Massachusetts, within the town of Springfield. We are agreed that such consequence necessarily follows; and we think that no hardship is thereby imposed on those inhabitants; because they are not interested in any election made within the State; or held to pay any taxes imposed by its

authority, nor bound by any of its laws—And it might be very inconvenient to the United States to have their laborers, artificers, officers and other persons employed in their service, subjected to the services required by the commonwealth of the inhabitants of the several towns."

Cooley on Taxation (3d ed.), vol. 1, page 84, says:

"Persons and property not within the territorial limits of a state cannot be taxed by it. In such a case the state affords no protection, and there is nothing for which taxation can be equivalent. This rule is applicable . . . to persons who reside on lands *purchased by or ceded to* the United States for navy yards, forts, . . . etc., where the state has reserved no other jurisdiction than that to serve process."

The case of *State of Indiana ex rel. Wolf v. Pullman Palace Car Co.,* 16 Fed. 193, defines the limits of the state power of taxation as being co-extensive with its sovereignty and reaches all the property in the state which is not within the jurisdiction of the Federal government, the court holding that, while the taxing power of the state is unlimited within its jurisdiction, it cannot, however, be exercised over persons or property beyond its territory or jurisdiction. To the same effect see *Central Railroad Co. of New Jersey v. Jersey City,* 70 N. J. L. 81, 56 Atl. 239; and *People ex rel. Hatch v. Reardon,* 184 N. Y. 431, 77 N. E. 970, 112 Am. St. 628, 8 L. R. A. (N. S.) 314; and the *Cleveland etc. R. Co. v. Pennsylvania (State Tax on Foreign-Held Bonds),* 15 Wall. (82 U. S.) 300, where the supreme court said:

"The power of taxation, however vast in its character and searching in its extent, is necessarily limited to subjects within the jurisdiction of the state. These subjects are persons, property, and business. Whatever form taxation may assume, whether as duties, imposts, excises, or licenses, it must relate to one of these subjects."

The supreme court of the United States, in *Fort Leavenworth R. Co. v. Lowe,* 114 U. S. 525, discusses this question in a most exhaustive and interesting opinion by Mr. Justice Field, in the course of which he says:

"When the title is acquired *by purchase* by consent of the Legislatures of the States, the federal jurisdiction is exclusive of all State authority. This follows from the declaration of the Constitution that Congress shall have 'like authority' over such places as it has over the district which is the seat of government; that is, the power of 'exclusive legislation in all cases whatsoever.' Broader or clearer language could not be used to exclude all other authority than that of Congress; and that no other authority can be exercised over them has been the uniform opinion of Federal and State tribunals and of the Attorneys General.

"The reservation which has usually accompanied the consent of the States that civil and criminal process of the state courts may be served in the places purchased, is not considered as interfering in any respect with the supremacy of the United States over them; but is admitted to prevent them from becoming an asylum for fugitives from justice. . . .

"Thus, in *United States v. Cornell,* 2 Mass. 60, it was held by Mr. Justice Story, that the purchase of land by the United States for public purposes, within the limits of a state, did not of itself oust the jurisdiction or sovereignty of the state over the lands purchased; but that the purchase must be by consent of the legislature of the state, and then the jurisdiction of the United States under the Constitution became exclusive. . . .

"These authorities [cited in the opinion in preceding paragraphs] are sufficient to support the proposition which follows naturally from the language of the Constitution, that no other legislative power than that of Congress can be exercised over lands within a state purchased by the United States with her consent for one of the purposes designated; and that such consent

under the Constitution operates to exclude all other legislative authority.

"But with reference to lands owned by the United States, acquired by purchase without the consent of the State, or by cessions from other governments, the case is different. Story, in his Commentaries on the Constitution, says: 'If there has been no cession by the State of the place, although it has been constantly occupied and used under purchase, or otherwise, by the United States for a fort or arsenal, or other constitutional purpose, the state jurisdiction still remains complete and perfect;' and in support of this statement he refers to *People v. Godfrey,* 17 Johns. 225. In that case the land on which Fort Niagara was erected, in New York, never having been ceded by the State to the United States, it was adjudged that the courts of the State had jurisdiction of crimes or offenses against the laws of the State committed within the fort or its precincts, although it had been garrisoned by the troops of the United States and held by them since its surrender by Great Britain, pursuant to the Treaties of 1793 and 1794. In deciding the case, the court said that the possession of the post by the United States must be considered as a possession for the State, not in derogation of her rights, observing that it regarded it as a fundamental principle that the rights of sovereignty were not to be taken away by implication. 'If the United States,' the court added, 'had the right of exclusive legislation over the Fortress of Niagara they would have also exclusive jurisdiction; but we are of the opinion that the right of exclusive legislation within the territorial limits of any State can be acquired by the United States only in the mode pointed out in the Constitution, *by purchase, by consent of the Legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.'* The essence of that provision is that the state shall freely cede the particular place to the United States for one of the specific and enumerated objects. This jurisdiction cannot be acquired tortiously by disseisin of the state; much less can it be acquired by mere occupancy, with

the implied or tacit consent of the State, when such occupancy is for the purpose of protection.'

"Where, therefore, lands are acquired in any other way by the United States within the limits of a State than by purchase with her consent, they will hold the lands subject to this qualification; that if upon them forts, arsenals, or other public buildings are erected for the uses of the General Government, such buildings with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed. Such is the law with reference to all instrumentalities created by the general Government. Their exemption from state control is essential to the independence and sovereign authority of the United States within the sphere of their delegated powers. But when not used as such instrumentalities, the legislative power of the State over the places acquired will be as full and complete as over any other places within her limits.

"As already stated, the land constituting the Fort Leavenworth Military Reservation was not purchased, but was owned by the United States by cession from France many years before Kansas became a State; and whatever political sovereignty and dominion the United States had over the place comes from the cession of the State since her admission into the Union. It not being a case where exclusive legislative authority is vested by the Constitution of the United States, that cession could be accompanied with such conditions as the State might see fit to annex, not inconsistent with the free and effective use of the fort as a military post. . . .

"We are here met with the objection that the Legislature of a State has no power to cede away her jurisdiction and legislative power over any portion of her territory, except as such cession follows under the Constitution from her consent to a purchase by the United States for some one of the purposes mentioned. If this were so it would not aid the Railroad Company; the jurisdiction of the State would then remain as it

previously existed. But aside from this consideration, it is undoubtedly true that the state, whether represented by her Legislature, or through a convention specially called for that purpose, is incompetent to cede her political jurisdiction and legislative authority over any part of her territory to a foreign country, without the concurrence of the general government. The jurisdiction of the United States extends over all the territory within the States, and, therefore, their authority must be obtained, as well as that of the State within which the territory is situated, before any cession of sovereignty or political jurisdiction can be made to a foreign country. And so when questions arose as to the northeastern boundary, in Maine, between Great Britain and the United States, and negotiations were in progress for a treaty to settle the boundary, it was deemed necessary on the part of our government to secure the cooperation and concurrence of Maine, so far as such settlement might involve a cession of her sovereignty and jurisdiction as well as title to territory claimed by her, and of Massachusetts, so far as it might involve a cession of title to lands held by her. Both Maine and Massachusetts appointed commissioners to act with the Secretary of State, and after much negotiation the claims of the two states were adjusted, and the disputed questions of boundary settled. The Commissioners of Maine were appointed by her Legislature; and those of Massachusetts by her Governor under authority of an act of her Legislature. It was not deemed necessary to call a convention of the people in either of them to give to the commissioners the requisite authority to act effectively for their respective states. 5 Webster's Works, 99; 6 Id. 273.

"In their relation to the general government, the States of the Union stand in a very different position from that which they hold to foreign governments. Though the jurisdiction and authority of the General Government are essentially different from those of the State, they are not those of a different country; and the two, the State and general government may deal with each other in any way they may deem best to carry out the purposes of the Constitution. It is

for the protection and interests of the States, their people and property, as well as for the protection and interests of the people generally of the United States, that forts, arsenals, and other buildings for public uses are constructed within the States. As instrumentalities for the execution of the powers of the General Government, they are, as already said, exempt from such control of the states as would defeat or impair their use for those purposes; and if, to their more effective use, a cession of legislative authority and political jurisdiction by the State would be desirable, we do not perceive any objection to its grant by the legislature of the state. Such cession is really as much for the benefit of the State as it is for the benefit of the United States. It is necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the State.

"The Military Reservation of Fort Leavenworth was not, as already said, acquired by purchase with the consent of Kansas. And her cession of jurisdiction is not of exclusive legislative authority over the land, except so far as that may be necessary for its use as a military post; and it is not contended that the saving clause in the act of cession interferes with such use. There is, therefore, no constitutional prohibition against the enforcement of that clause. The right of the State to subject the railroad property to taxation exists as before the cession."

That case establishes that property purchased by the Federal government within the state and by its consent for the purposes enumerated in the constitution is held by the government in its proprietary and sovereign capacity only when there has been a cession of sovereignty by the state; that property owned by the Federal government, of which it had both proprietary and sovereign jurisdiction prior to the admission of the state into the Union, is, after such admission, held by the Federal government only in its proprietary

capacity, unless the state, after its creation, cedes sovereignty, and that such cession of sovereignty may be as restricted as the state sees fit to grant; that property acquired by the Federal government without consent of the state, as by condemnation or otherwise, is held by the Federal government in its proprietary capacity only; that the various states can cede to the Federal government sovereignty over lands which are held in Federal proprietorship, with such limitations upon that cession of sovereignty as the state may impose, but that, where such cession of sovereignty is made to the Federal government of property acquired by the Federal government *by purchase* and with the state's consent and for the purposes enumerated in the constitution, the cession of the state's sovereignty must be complete.

To the point that, where land within the state is purchased by the Federal government for the purposes enumerated in the constitution with consent of the legislature, Federal jurisdiction of the same is exclusive of state jurisdiction, see *Sharon v. Hill,* 24 Fed. 726; *Martin v. House,* 39 Fed. 694. In *Bannon v. Burnes,* 39 Fed. 892, the circuit court of Missouri said:

"'So the sovereign — the local state government — consented to this purchase by the superior government before it was made, and covenanted on its part that, when the United States should acquire the title of the owner, the jurisdiction of the state should cease over the property, and that of the United States should attach, with the single reservation of the right of entry for service of legal process. Then follows the covenant of assurance that, whenever the state obtained such property by purchase or grant, the property thenceforth should be forever 'exonerated from all taxes, assessments, and other charges, which may be levied or imposed under the authority of the state.' The taxing power is the attribute of sovereignty, and the exercise of the highest jurisdiction. As it is a

power to be exercised or forborne at the will of the sovereign having jurisdiction, it follows logically that the sovereign may cede away such right, and release the burden. And when the grant has been accepted by the general government, and the conditions of the purchase have been fully performed, such grant becomes a solemn compact, which the general government would not permit the state to violate. The term 'exonerated' was, presumably, employed in its ordinary acceptation; 'to be relieved of as a charge; to be discharged or exempted.' Be the contention of plaintiff's counsel correct, that the lien of the city government on this property, so far as the owner and all other persons were concerned, attached on the 1st day of January, 1879, yet under the city charter (section 4, art. 6) the fiscal year begins on the third Monday in April, which in 1879 was the 21st day of April. The assessment is made between the 1st day of January and the third Monday of April, and is delivered to the council at its first meeting of the fiscal year. The council then by ordinance proceeds 'to levy taxes for the fiscal year.' A copy of this, with the assessment books, is delivered to the auditor, who then extends the taxes, and delivers the tax-book to the collector on the 1st day of May. Sections 20, 21. From which it is manifest that the taxes for the year 1879 were not levied until after the 9th day of April, and after the United States had acquired title to the property by purchase. . . . The state, by the act of cession, covenanted, in effect, that when the government should purchase this property it would not thereafter make any levy; and if the state itself had proceeded as did the city to make a levy for the purpose of taxation, after the 9th day of April, 1879, this property would have been exonerated therefrom. The municipal corporation of Kansas City is an integral part of the state. It is but an adjunct of the state power, to aid in carrying out the ends of government. It is therefore no less an action taken by the state when done through the agency of a subordinate municipal corporation. When the superior sovereignty ceded away its right and jurisdiction to make this levy and sale,

it necessarily negatived and withdrew the power of its inferior, existing by its consent, and acting as one of its governmental instruments, to do that which itself could not.''

In the case of *In re Ladd,* 74 Fed. 31, it was held that the state had no jurisdiction over crimes committed at Fort Robinson, the title to the land within the fort having been acquired from France in 1803, but when Nebraska was admitted to the Union in 1867, the land, then not being used for military purposes, passed into the jurisdiction of the state. In 1876, a military reservation was established there by the government, and in 1887 the legislature of Nebraska ceded jurisdiction of the reservation with certain conditions. The court held that the cession of jurisdiction created by the act of 1887 was legal, and when it went into effect the jurisdiction was wholly ceded to the United States, and until that exclusive jurisdiction is terminated by the Federal government ceasing to own or exercise control thereof or retrocedes it to the state, such cession was within the legislative power of the state, the court saying:

''Here we find that there were parties competent to contract; a subject-matter to be contracted about; an agreement reached, as evidenced by the adoption of the act of March, 1887, by the legislature of the state, and its acceptance by the United States; and a sufficient consideration, in the large outlay of money made by the United States in the enlargement of the post, and other improvements made on the reservation. . . . By the cession of jurisdiction contained in the act of March, 1887, the state had parted with the power of legislative control over the reservation, except in the matter of service of process, and in regard to roads and highways; and under the provisions of section 10, art. 1, of the constitution of the United States, the state could not abrogate the contract it had entered into with the United States.''

*State ex rel. Jones v. Mack,* 23 Nev. 359, 47 Pac. 763, held that, where a state cedes to the United States exclusive jurisdiction of land purchased by consent for a public building, for all purposes except enforcement of "criminal laws of this state," there was no jurisdiction for the punishment of crimes on the reservation, but only the right to execute criminal process there for a violation of the laws of the state committed elsewhere within the state.

*United States v. Bateman,* 34 Fed. 86, recognizes the rule as set forth in the above cases, but distinguishes that case for the reason that therein the Federal government had retroceded to the state its jurisdiction over territory purchased by consent of the state for the location of a national home for disabled soldiers. In that case it is said:

"These observations are, as applicable to the Presidio as to the Fort Leavenworth reservation, as will be seen by reference to the act admitting California. The only reservation relating to the public land affected the proprietary interest of the United States in the lands. That interest was to be in no way interfered with. There was no reservation whatever as to sovereignty, or governmental powers or jurisdiction. There was no distinction made in the act of admission between these lands and other lands constituting the public domain in California. There being no reservation of governmental powers or jurisdiction over the Presidio lands in the act admitting California into the Union, in the language of the supreme court in the case cited, 'the United States, therefore, retained, after the admission of the state, only the rights of an ordinary proprietor.' And, again, says the court; 'The consent of the states to the purchase of lands within them for the special purposes named is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States,

unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor.' The United States were both proprietors and sovereigns of the Presidio lands till the admission of the state of California into the Union. By the act of admission, reserving only their proprietary right over these lands, they relinquished to the state their governmental or local sovereign right, and jurisdiction, and were thenceforth only proprietors in the sense that any natural person owning land is a proprietor. Having so relinquished their sovereign rights, that condition remains to this day, unless the state has in some way, either directly or by implication, receded to the United States its sovereign jurisdiction. This could be done by direct cession, or by consenting through its legislature to the purchase of land for such governmental purposes, and a purchase for such purposes in pursuance of such consent. Neither has been done in this instance. There is no act directly ceding the jurisdiction. By the act of 1852, we have seen, the legislature in the proper form consented that the United States might purchase lands for certain specific purposes, including military purposes. But these lands were not so purchased. They were owned by the United States before California became a state, and by her admission into the Union the sovereignty was relinquished.''

*Exum v. State,* 90 Tenn. 501, 17 S. W. 107, 25 Am. St. 700, 15 L. R. A. 381, seems to hold contrary to the rule here announced, but in that case there was a dissenting opinion by Justices Lurton and Snodgrass, which weakens the effect of the main opinion, in itself ill-considered.

It is, of course, true that the Federal government may acquire any land which it may see fit by purchase, without the consent of the state or by the exercise of eminent domain. *Van Brocklin v. State of Tennessee,* 117 U. S. 151; *Chappell v. United States,* 160 U. S. 499.

The reservations, so often contained in the cession accompanying the consent for the Federal government

to obtain by purchase, that the process of the state courts may be served in the places purchased, in actions arising outside such places, is intended to prevent such reservations from becoming the asylums of fugitives from justice, and is not invalid as interfering with the exclusive jurisdiction of the United States. In the Federal constitutional section to which we have called attention (section 8, article 1), the cession of jurisdiction which is made to the Federal government in furtherance or in conformity with that constitutional provision is an absolute cession, but a provision such as our act of cession contains for the service of process within the purchased lands does not make the cession conditional.

*United States v. Meagher,* 37 Fed. 875, holds that, where lands within a state are acquired by the Federal government in other ways than by purchase with the consent of the state and there has been no cession of sovereignty, the jurisdiction of the Federal government will, in the exercise of its ownership, be free from such state interference, as that would impair the effective use of the property for the governmental purposes for which it was acquired.

In *Crook, Horner & Co. v. Old Point Comfort Hotel Co.,* 54 Fed. 604, the court says:

"It [the supreme court of the United States] held moreover, that where land is acquired by the United States in any other manner than by such *actual purchase,* with the *consent of the state,* attended by a cession from the state of all jurisdiction over it, there the clause of the constitution giving the power of exclusive legislation to congress, and giving exclusive jurisdiction to the United States, does not apply. The court held that in this class of cases the United States takes the lands only under such a tenure, limited or unlimited, as the state confers by each special act of cession, and that such title is to be dealt with by the

courts precisely as if the land had been ceded by the state to a private individual. . . . However much these decisions may have disturbed opinions previously entertained by the legal profession, they are the supreme law of the land, and must be enforced by the courts. An inspection of the act of cession of Virginia conveying to the United States the lands of Old Point Comfort, belonging to herself, *and not purchased by the United States with her consent,* from any other owner, and ceding jurisdiction over them, will show that the case falls within the ruling of the supreme court in the two cases of *Railroad Co. v. Lowe* and *Railroad Co. v. McGlinn,* and that Fortress Monroe is held by the United States, not subject to clause 17, § 8, art. 1, of the constitution [the section heretofore discussed in this opinion] but only by the tenure prescribed by Virginia's act of cession of March 1, 1821, and her governor's deed of cession of December 12, 1838. These acts contain quite a number of very material limitations of the power of the United States over the land at Old Point Comfort. . . .''

In *In re Kelly,* 71 Fed. 545, it was held that purchase of land in the state by the general government with the consent of the legislature does not *ipso facto* confer on the general government exclusive jurisdiction unless the purchase is for one of the purposes distinctly named in article 1, § 8, of the constitution, but in order that exclusive jurisdiction may be acquired over land taken for any other purpose, the consent of the state government and the cession of its jurisdiction must be declared unequivocally and it must appear conclusively that the state is ceding exclusive jurisdiction, in order to oust it completely of jurisdiction. See, also, *Ex parte Gaines,* 56 Ark. 227, 19 S. W. 602; *Barrett v. Palmer,* 135 N. Y. 336, 31 N. E. 1017, 31 Am. St. 835, 17 L. R. A. 720.

But the cession of jurisdiction to the Federal government over property not acquired as provided in

the constitution may be accompanied by such conditions as the state may see fit to annex, as long as those conditions are not inconsistent with the use of the property for the purposes for which it is purchased. *Territory v. Burgess,* 8 Mont. 57, 19 Pac. 558, 1 L. R. A. 808, and *Barrett v. Palmer* and *United States v. Bateman,* above. The *Burgess* case holds that the jurisdiction of the United States over Fort McGinnis Military Reservation was not exclusive for the reason that the reservation was a part of the territory of Montana, and that the Federal government possessed sovereignty as long as there existed territorial government. To the same effect, see *Rice & Quinette v. Hammond,* 19 Okl. 419, 91 Pac. 698, where the supreme court of Oklahoma held that the county taxing officers had a lawful right to levy and collect taxes on personal property belonging to private individuals located on the Fort Sill Military Reservation. It appears from the case that Oklahoma at the time was a territory and, as such, Congress had a right to legislate therefor, and Congress having granted the right to subject all property to taxation, it was immaterial that part of the property was located on a government reservation. The court said:

"Counsel have overlooked the fact that Congress has not only exclusive legislative control over military reservations in the territories, but it has legislative control of the territories themselves. The Fort Sill military reservation is within the organized county of Comanche and constitutes a part thereof. The persons and property within such reservation have the protection of the laws of the territory, and it is only equitable that the property therein not belonging to the United States should pay a part of the expenses of the same. If Congress had intended that the property on this or other reservations in the territory should not be taxed, it would have so declared, as it did with

reference to property of the United States and property belonging to certain Indians.''

As was decided in *Fort Leavenworth R. v. Lowe,* above, the legislatures of the various states have power to cede sovereignty to the Federal government of any territory within the state, and it appears from the record in this case that the title to the property here in question had been donated to the Federal government by Pierce county, and the state having the power to cede exclusive jurisdiction thereover, or with such reservations as the legislature might desire to make, it follows that the Federal government by such cession, made by the state confirming the donation of Pierce county, acquired such jurisdiction as was ceded. Were this a case where Camp Lewis had been purchased by the consent of the state, the legislature could have only ceded exclusive jurisdiction subject to the modifications we have noted, that is, that the state could have reserved the right to serve civil and criminal process in actions arising out of the Federal reservation.

It is to be borne in mind that we are not here concerned with the question of whether the personal property owned by the appellant might or might not be assessed and taxed against it at its place of residence within the state.

The rule here announced does not conflict with those cases, among which is *Page v. Pierce County,* 25 Wash. 6, 64 Pac. 801, which allow the taxation of property on Indian reservations, as there is no question but that such property is territorially within the confines of the state, nor does this opinion conflict with the right of the state to assess and tax improvements upon public lands, which improvements have been construed as personal property for the purposes of taxation. *Percival v. Thurston County,* 14 Wash. 586, 45 Pac. 159.

From the foregoing considerations, it appears that the demurrer should have been overruled, and for that reason the judgment of the lower court is reversed.

HOLCOMB, C. J., PARKER, MITCHELL, and MAIN, JJ., concur.