65 Wn.2d 342 (1964)
396 P.2d 979
DuPONT-FORT LEWIS SCHOOL DISTRICT No. 7, Respondent,
v.
CLOVER PARK SCHOOL DISTRICT NO. 400 et al., Appellants.[*]
No. 37697.
The Supreme Court of Washington, Department One.
December 3, 1964.
*343 Murray, Scott, McGavick & Graves, by Ray Graves, for appellant Clover Park School District No. 400.
The Attorney General and Bruce W. Cohoe, Assistant, for appellant Louis Bruno.
Brodie, Fristoe & Taylor, for respondent.
HILL, J.
The DuPont-Fort Lewis School District seeks a declaratory judgment to determine whether it or the Clover Park School District is entitled to the attendance credit (and the financial emoluments flowing therefrom) for certain pupils living on the Fort Lewis Military Reservation.
During the 1962-63 school year, 93 elementary school children living on that portion of the Fort Lewis Military Reservation, which is within the boundaries of the Clover Park School District (hereinafter called Clover Park), attended an elementary school on that portion of the Fort Lewis Military Reservation within the boundaries of the DuPont-Fort Lewis School District (hereinafter called DuPont) and operated by that district. Clover Park also operated an elementary school within its boundaries on the Fort Lewis Military Reservation.
The question for determination is: Which district is entitled to the attendance credit for these 93 elementary school children (14,521 days) and the apportioned funds in the amount of $24,753 predicated upon that attendance.
The Superintendent of Public Instruction for the State of Washington (hereinafter called State Superintendent) is a party to the action because he determined that the attendance credit and the apportioned funds should go to Clover Park.
DuPont then brought this action in the Superior Court of Thurston County, challenging that determination. The superior court reached the conclusion that DuPont was entitled to the attendance credit and directed the State Superintendent to take the necessary steps to make the $24,753 available to DuPont. Clover Park and the State Superintendent appeal.
*344 To accept the facts as we have stated them, i.e., recognizing the existence of school district boundary lines within the Fort Lewis Military Reservation, would seem to make RCW 28.48.040, 050[1] the applicable statutes, and to sustain the position taken by Clover Park and the State Superintendent. These statutes, in substance, provide that the district in which a pupil lives (is a resident) shall receive the attendance credit rather than the district in which the pupil actually attends school, unless mutually agreed otherwise by the directors of the two districts. There was no such mutual agreement here.
However, DuPont presents an argument, which was convincing to the trial court and which is not without support in our prior statements,[2] particularly in Concessions Co. v. Morris (1919), 109 Wash. 46, 51, 186 Pac. 655, 657. Briefly stated, the contention in behalf of DuPont is that school district lines within a military reservation are meaningless *345 because the state, or its subdivisions, has no authority and no jurisdiction therein. The jurisdiction of the United States is exclusive therein, except as it expressly consents to the exercise of state authority. The districts can levy no taxes within the reservation; residents within the reservation have no vote in district elections and cannot be officers of the district. The districts could operate no schools within the reservation, except with the consent of United States authorities in charge of the reservation.[3]
In Concessions Co. v. Morris, supra, where we were considering the taxability of personal property belonging to a concession company permitted by the United States to operate barber shops within the Fort Lewis Military Reservation, we said:
"... the answer to this is clear, and that such property is without the state in both a jurisdictional and territorial sense, for, as we have seen by the constitution of the United States, and the act of the legislature of this state, both the military reservation itself and the jurisdiction and legislation over it have been granted to the United States, and thereby there has been created an independent sovereignty the territory of which is surrounded by the state of Washington, but over which the state of Washington has no jurisdiction. A territory has been created which resembles that of the District of Columbia, the only reservation being that the state of Washington can serve civil and criminal process therein on actions arising outside the reservation."
Supported by such sweeping language, DuPont urged that the military reservation cannot be part of a subdivision of the state such as a school district; that the children living within the reservation cannot be subjected to compulsory school attendance; that they do not have to go to school at all and, if they go to school, they can go to the school of their choice. By the same token, the schools of the state are under no obligation to admit them, except upon the *346 payment of tuition; but the state has provided, by RCW 28.58.210[4], that such children "shall be admitted to the public school, or schools, of any contiguous district without payment of tuition."
The reasoning is ingenious and, when supported by some of the language we have used, quite plausible. However, as the authorities hereinafter cited will substantiate, the conveyance to the United States of the land within the military reservation did not obliterate the lines of the then existing school districts.
RCW 28.58.210 was not intended to give children living in a school district the right to elect to attend school in some other district. But even if we were to assume that there were no school districts within the reservation and that the children living within the reservation could attend the schools of any district contiguous to the reservation without the payment of tuition, our present problem is not solved.
[1] DuPont and Clover Park (and any other school district whose lines come up to the reservation) would be contiguous districts. If the 93 children, with whose attendance we are here concerned, elected to attend one of the DuPont elementary schools (all of which are on the military reservation), it is clear that the statute gave them the right to do so without the payment of tuition. This is a personal right granted to the child living on the military reservation.
That statute does not make any provision for compensating the district where the child attends school without the *347 payment of tuition.[5] To secure compensation for its services, DuPont must rely on some other statute; it does not indicate which one.
If DuPont has been operating all of its elementary schools outside of its district, as it must have been if we assume the validity of its argument that there have been and are no school districts within the reservation, there should be some statutory basis for its authority to do so; however, none is suggested.
We cannot agree, either as a legal or practical matter, that DuPont and Clover Park have been maintaining and operating schools beyond their district limits when they maintain and operate schools within the military reservation. All apportioned funds received by both districts have been on the basis that they were operating schools within their own districts. Significantly, DuPont operated no schools on the military reservation within the area Clover Park has claimed and continues to claim as part of its district. Both districts have recognized what DuPont now claims to be a nonexistent boundary line within the reservation.[6]
[2] Turning to the applicable law, we find it to be well established that acquisition by the United States of land situated within a school district for military purposes does not detach such territory from the district or remove it therefrom, but it remains a part thereof.
*348 In a recent case (Harmony Grove School Dist. No. 1 v. Camden School Dist. No. 35 (1957), 227 Ark. 902, 903, 302 S.W. (2d) 281, 282), the Arkansas court was called upon to answer the question:
"... `Were the legal rights or jurisdiction of the Harmony Grove District, for school purposes, divested by the acquisition of the land within the geographical boundaries of said district by the federal government in 1944, as to the territory thus acquired, and the formation by the government into a federal area now known as the Naval Ammunition Depot Area?' ..."
The parents of children in this Naval Ammunition Depot Area desired that their children attend a school in the Camden School District, claiming that the area was no longer a part of any school district. The trial court had held, as here, that after the acquisition by the United States of the tract as an arsenal or munitions plant, it was no longer a part of the Harmony Grove School District and the district had been divested of all jurisdiction and legal rights. The Arkansas Supreme Court, after reviewing the authorities, reversed the trial court saying:
"We hold that the jurisdiction or legal rights of the Harmony Grove District for school purposes over the area in question were not divested by its acquisition by the United States in 1944; and that the posed question should be answered in the negative...." 227 Ark. at 906, 302 S.W. (2d) at p. 284.
The Iowa court passed upon the same question in Hufford v. Herrold (1920), 189 Iowa 853, 857, 179 N.W. 53, 54, saying:
"... The acquisition by the United States government of a portion of the territory included within said district for military purposes, it is true, deprived the district of the right to levy and collect taxes therefrom, but our attention is called to no statutory provision or other authority to the effect that such action changed the boundaries of said district, or took the land thus acquired by the government out of the territorial limits of the district, ..."
We find the same question raised with reference to the Fort Bliss Military Reservation in Texas; and the Supreme Court there said:
*349 "At the time the Federal government enlarged the area of the Fort Bliss Military Reservation, the added area was a part of various school districts in El Paso County, other than El Paso Independent School District. The taking over of this area by the Federal government did not remove such area from the respective school districts, nor did it serve to change the boundaries of these districts. It is true that the state and all of its subdivisions lost all power to tax or control the area and the property situated thereon, except as may be agreed upon by the State and Federal authorities. But for the two orders passed by the State Board of Education attaching and including such area to the El Paso Independent School District, the area would have remained in, and as a part of, those other school districts to which it belonged at the time of the taking over of such area by the Federal government." Central Education Agency v. Independent School Dist. El Paso (1953), 152 Tex. 56, 61, 254 S.W. (2d) 357, 359.
While not school district cases, Howard v. Commissioners of the Sinking Fund of Louisville (1953), 344 U.S. 624, 97 L.Ed. 617, 73 S.Ct. 465, Wichita Falls v. Bowen (1944), 143 Tex. 45, 182 S.W. (2d) 695, 154 A.L.R. 1434 and Norfolk Cy. v. Portsmouth (1947), 186 Va. 1032, 45 S.E. (2d) 136, are of interest as recognizing the right of cities to annex federal enclaves. In Howard, the right of Louisville to annex an ordnance plant was recognized; and in the Texas case the right of Wichita Falls to annex Sheppard Field (a military reservation under the exclusive jurisdiction and control of the federal government) was upheld, as was the right of Portsmouth to annex a navy yard in the Virginia case.
In Howard, the United States had acquired the land by condemnation with the consent of the legislature of Kentucky. The Secretary of the Navy accepted exclusive jurisdiction over the area and the Governor of Kentucky acknowledged the acceptance. By ordinances enacted in 1947 and 1950, the city annexed certain territory including the ordnance plant tract. The annexation was not challenged by the United States. The court said:
"The appellants first contend that the City could not annex this federal area because it had ceased to be a part *350 of Kentucky when the United States assumed exclusive jurisdiction over it. With this we do not agree. When the United States, with the consent of Kentucky, acquired the property upon which the Ordnance Plant is located, the property did not cease to be a part of Kentucky. The geographical structure of Kentucky remained the same. In rearranging the structural divisions of the Commonwealth, in accordance with state law, the area became a part of the City of Louisville, just as it remained a part of the County of Jefferson and the Commonwealth of Kentucky. A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States. Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the area. A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property. The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government. The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed." 344 U.S. 626-627, 97 L.Ed. 620-621, 73 S.Ct. 466-467.
And, in the Texas case, it was said:
"If we properly interpret Bowen's motion for rehearing, he contends that since Sheppard Field is a United States military reservation, under the exclusive jurisdiction and control of the Federal Government, the City of Wichita Falls had no power to assume jurisdiction over it by annexing it thereto. We are not impressed with this contention. Certainly Sheppard Field is a part of the State of Texas, and this is so even though we concede that it is under the exclusive jurisdiction and control of the United States Government. By the same token, it can be part of an incorporated city within this State. Of course, the power of the city, like the power of the State, to exercise jurisdiction and control over its territory may be curtailed, and even suspended, during the time it is under the jurisdiction and control of the United States Government; but that fact would not justify a holding that it cannot become a part of the area of an incorporated city." 143 Tex. 52, 182 S.W. (2d) 699.
*351 We are not here concerned with any conflict of jurisdiction. We are concerned with whether the land on which 93 children lived, concededly in the Fort Lewis Military Reservation, could also be in the Clover Park School District. For the reasons indicated, we are satisfied that it could be and was; hence, it follows that in the absence of any agreement between Clover Park and DuPont, the former was entitled (under RCW 28.48.040, 050) to credit for such school attendance. This is decisive of the case.
The cause is remanded to the Superior Court of Thurston County with instructions to set aside the judgment appealed from and to enter a judgment favorable to the Clover Park School District.
OTT, C.J., ROSELLINI, HUNTER, and HALE, JJ., concur.
February 15, 1965. Petition for rehearing denied.
NOTES
[*] Reported in 396 P. (2d) 979.
[1] "Credits for nonresident attendance. If a pupil attends any public school of the state, outside of his resident district, up to the ninth grade, during the time the resident district maintains a school of the grade in which the pupil belongs, the attendance shall be credited to the district in which the pupil resides, unless mutually agreed otherwise by the directors of the two districts." RCW 28.48.040

"Procedure for obtaining nonresident attendance credit. The clerk of any district whose resident pupils are attending school in another district may notify the clerk of the district where such pupils attend, when the school of said pupils' resident district will be in session, and of the grades that will be maintained, and he must file a duplicate copy of said notice with the county superintendent. He must name the pupils in his notice, and it shall be the duty of the district clerk so notified, on or before the thirtieth day of June, to certify to the clerk of the resident district the actual number of days' attendance at school of such pupils during the time that a school of the grade to which the pupil or pupils properly belong was in session in their resident district. And in case said clerk shall fail or refuse to furnish such information to the clerk of the resident district, then it shall be the duty of the county superintendent to grant to the district to which the attendance belongs the maximum number of days claimed by the clerk of the said district. Without the notice herein required by the clerk of the resident district, all claims to attendance will be forfeited." RCW 28.48.050.
[2] Prior statements are not to be confused with prior holdings. Courts generally, and this one is no exception, frequently use language much broader in its scope than required for the decision of the particular matter presently before them.
[3] All school buildings and facilities operated by the districts on the Fort Lewis Military Reservation were built by the United States, and the districts have used and occupied the buildings under a permit for school purposes issued by the U.S. Department of Health, Education and Welfare.
[4] "Children on U.S. reservations  U.S. authorities to cooperate. Any child who is of school age and otherwise eligible residing within the boundaries of any military, naval, lighthouse, or other United States reservation, national park or national forest or residing upon rented or leased undeeded lands within any Indian reservation within the state of Washington, shall be admitted to the public school, or schools, of any contiguous district without payment of tuition: Provided, The United States authorities in charge of such reservation or park shall cooperate fully with the state, county, and school district authorities in the enforcement of the laws of this state relating to the compulsory attendance of children of school age, and all laws relating to and regulating school attendance." RCW 28.58.210
[5] As originally enacted in 1925, that statute did provide for a division of the cost between the state and the county (Laws of Ex. Ses. 1925, chapter 93, § 1); and as amended in 1933 (Laws of 1933, chapter 28, § 10), it provided for reimbursement from the current state school fund on the basis of one and one-half days' attendance for each day's attendance. When last amended in 1945 (Laws of 1945, chapter 141, § 10), all mention of payment or reimbursement was omitted.
[6] It would be interesting to know what territory DuPont claimed in its application for federal assistance. Attached to its Supplemental Complaint is a document in which "The applicant [DuPont] gives assurance to the Commissioner of Education that as of the close of the 1963 fiscal year the district belonged to the same legal classification as described in the application form RSF-1 (1962-63) and comprised the same territory." (Italics ours.)