# Wytheville

## County of Henrico, Windsor Farms, Inc., and Others v. City of Richmond.

June 9, 1941.

Record Nos. 2354-2355.

Present, All the Justices.

*Hunton, Williams, Anderson, Gay & Moore* and *H. M. Ratcliffe,* for the appellant county of Henrico.

*McGuire, Riely, Eggleston & Bocock, William H. King, Collins Denny, Jr., Fielding L. Williams, Lewis C. Williams, Hunsdon Cary, T. Justin Moore* and *Robert G. Cabell,* for the appellants Windsor Farms and others.

*Horace H. Edwards, J. E. Drinard* and *John P. McGuire, Jr.,* for the appellee.

EGGLESTON, J., delivered the opinion of the court.

The subject matter of this controversy is the extension of the corporate limits of the city of Richmond by the annexation of certain territory from Henrico county. The prerequisite annexation ordinance (Code, §2956, as amended by Acts 1924, ch. 441, p. 663), enacted by the city council, embraced seven separate parcels of land aggregating 8.29 square miles and designated on the maps used in the trial below as follows:

Parcel "E," comprising the suburban subdivisions known as Windsor Farms, Paxton, Hill Crest, and others, lying west of the city, and bounded roughly on the south by the James River, on the west by the Three Chopt road, and on the north by Patterson avenue (which parcel was enlarged by the order to include the grounds of the University of Richmond and a narrow connecting link); Parcel "D" on the north of the city, comprising the territory between the city limits and Bryan Park and Westbrook avenues (enlarged by the order to include the grounds of the city tuberculosis hospital, known as Pine Camp, and certain colored settlements); Parcel "C," a small area to the northeast of the city, bounded on the east and south by Ladies' Mile road, on the west by Moss Side avenue, and on the north and northeast by Cannon's road; Parcels "B," "A," "H" and "G," which are irregular tracts situated on the east of the present city boundary north of the James River; and Parcel "F," being the bed of the James River from the eastern city limits to the recently constructed city Deep Water Terminal.

After the prescribed notice had been given to the proper officials of the county and had been published as required by Code, §2957 (as amended by Acts 1924, ch. 441, p. 663), the Hon. Frederick W. Coleman, judge of the Fifteenth Judicial Circuit, and Hon. A. D. Barksdale, judge of the Sixth Judicial Circuit, were designated to sit with Hon. Julien Gunn, judge of the Circuit Court of Henrico county, and to hear and determine the case.

The county of Henrico and certain interveners appeared specially and filed written motions to dismiss the proceedings for lack of jurisdiction. These were overruled, the case was heard on the merits and resulted in a judgment favorable to the city, which is here for review.

We shall first deal with the assignments of error which challenge the rulings of the lower court on the several motions to dismiss the proceedings.

The record discloses that in February, 1938, both branches of the city council adopted two separate ordinances, the one preliminary to the annexation of territory in Henrico county, and the other preliminary to the annexation of territory in Chesterfield county. The two ordinances passed the respective branches of the council at the same meetings.

The contention of the county is that the adoption of these two ordinances by the council at the same time shows a single plan of the city to annex territory in both counties, that the "single, comprehensive and integrate plan for the annexation of territory" in both counties should have been incorporated in a single ordinance and should have been followed by the institution of a single annexation proceeding in the Circuit Court of Henrico county, wherein the greater part of such territory lies.

So much of Code, §2956 (as amended by Acts 1924, ch. 441, p. 663), as is here material, provides as follows:

"Whenever it is deemed desirable by any city or town to annex any territory to such city or town, its council shall declare by an ordinance, which shall be passed by a recorded affirmative vote of a majority of all the members elected to the council, or to each branch thereof, when there are two, that it desires to annex certain territory and shall accurately describe therein the metes and bounds of the territory proposed to be acquired, and set forth the necessity for or expediency of annexation, and the terms and conditions upon which it desires to annex such territory, as well as the provisions which are made for its future management and improvement. * * * "

So much of Code, §2957 (as amended by the same act), as is here material, provides as follows:

"In any annexation proceeding instituted the city or town shall give notice to the Commonwealth's attorney and the board of supervisors of the county or counties wherein such territory lies, that it will, on a given day, not less than thirty days thereafter, move the circuit

court of the county wherein the greater part of such territory lies, or the judges who shall hear the case, to make an order authorizing and declaring the annexation provided for in the said ordinance, with which notice shall be served a certified copy of such ordinance. * * * ''

We think the majority opinion of the lower court correctly held that under the above statutory provisions the city had the right or the option to proceed for the annexation of territory in both counties at the same time and in a single proceeding, but that it was not compelled to do so.

There is nothing in the language of the statutes which we have quoted to suggest that where a city desires to annex territory lying in two counties it must proceed jointly against such counties. Nor is any reason assigned why this procedure should be followed. Indeed, the conditions with respect to the acquisition of territory in the two counties may be such as to render it impracticable to proceed against them jointly.

It is true that Code, §2956, *supra,* provides for the enactment of ''an ordinance'' as the first step in the annexation proceedings, but there is no suggestion in the statute that a separate ''ordinance'' may not be adopted with respect to the acquisition of territory in each county.

Again, Code, §2957, *supra,* provides for notices to certain officials of the county whose territory is sought to be annexed. Here such notices are required where an annexation proceeding has been ''instituted,''—not one which has been planned or proposed. In the case at bar, while the city may have originally planned or proposed to annex certain territory in Chesterfield county, no proceeding has been ''instituted'' for that purpose. The ordinance with respect to the annexation of a part of that county may be repealed or disregarded and no proceeding may ever be ''instituted'' thereon.

The county next contends that the proceeding should be dismissed because, it says, the statutory procedure

was not followed in that the ordinances adopted by the city council failed to contain an accurate metes and bounds description of the territory proposed to be annexed, as required by Code, §2956, as amended.

The council of the city of Richmond consists of two branches, the common council and the board of aldermen. The annexation ordinances had been referred to a special joint committee from both branches. The committee recommended to the council the adoption of Ordinance "A." which provided for the annexation of certain areas in Henrico county, designated in the report as Parcels "A." through "F.," both inclusive, which were described by metes and bounds.

When this report reached the floor of the common council, the journal of that body discloses that:

"Mr. Griggs moved that said Ordinance 'A' be amended so as to include the parcels east of Seventh Street, as shown on map accompanying the report of the City Comptroller of January 20, 1937, as parcels 19, 20, 21 and 22, parcel 23 and parcel 24, inserting in the said ordinance 'A' proper metes and bounds descriptions to be prepared by the Director of Public Works, and having the lines of said parcels endorsed on the map attached to the ordinance to conform, said parcels to be shown as Parcel 'A' (revised) and parcels 'G' and 'H.' Adopted.

"The said ordinance 'A,' as amended, was placed on its passage and adopted—by the vote of 19 to 1."

The effect of the Griggs' amendment was to enlarge Parcel "A," as proposed by the special joint committee, and to add Parcels "G" and "H" to the territory proposed to be annexed.

Over the objection of the city, the county offered testimony to show that the metes and bounds description of the territory proposed to be annexed was not physically incorporated into the ordinance until the following day, and after the common council had adjourned; that the ordinance, as amended, was subsequently passed by the

board of aldermen but was not returned to the common council for approval after the addition of the metes and bounds description.

Consequently, the county contends that the common council has never adopted the amended ordinance containing the metes and bounds description of the property proposed to be annexed, required by Code, §2956, as amended.

■ We agree with the holding of the majority of the lower court that the recital in the journal of the council that the ordinance "as amended" was adopted, imported absolute verity and could not be contradicted by the evidence offered by the county.

■ In *Wise* v. *Bigger,* 79 Va. 269, 281, this court held that where the journal of the proceedings of the Senate of Virginia showed that a bill had been passed by an affirmative vote of two-thirds of the senators present, this imported absolute verity and could not be contradicted.

This is in accord with the weight of authority. 23 R. C. L., Records, §8, p. 159; *Capito* v. *Topping,* 65 W. Va. 587, 64 S. E. 845, 847, 22 L. R. A. (N. S.) 1089.

The same principle applies to the records of the legislative branch of municipalities. 23 R. C. L., Records, §9, pp. 159-160; 98 A. L. R., p. 1229, note, citing numerous cases.

Here the journal of the common council shows that the ordinance "as amended"—that is, after the proper metes and bounds description had been inserted—"was placed on its passage and adopted."

■ Moreover, in our opinion, the incorporation of the parcels to be added by reference to the "map accompanying the report of the City Comptroller of January 20, 1937," whereon they were accurately identified and described, was a substantial and sufficient compliance with the statutory requirement as to the metes and bounds description of the property which the city proposed to annex.

We think the trial court was right in overruling the county's motion to dismiss the proceeding.

Certain interveners moved to dismiss the proceeding for lack of jurisdiction, because, as they say, the present statutes permit the annexation of the *whole* of Henrico county, and then only after the approval of its voters, and do not permit the annexation of a part of the county as is sought in this proceeding.

These interveners point out that the Acts of 1930, ch. 167, p. 450 (Michie's Code of 1936, §§2773(10)-2773(23)), amended the Code of Virginia by adding thereto a new chapter, numbered 109-A, which permits any county in the State, having a population of five hundred inhabitants or more to the square mile, to adopt in a prescribed manner either the "Modified Commission Plan" or the "County Manager Plan" of county government.

Section 2773-1 of this act, Michie's Code of 1936, §2773(21), provides that:

"When a county has once adopted one of the forms of government provided for in this chapter, thereafter no part of its territory may be annexed by any city unless the whole county be annexed. In such latter case the county shall not be annexed until the question of annexation has been first submitted to a referendum of the voters of such county and approved by a majority of those voting thereon."

These interveners then point out that the Acts of 1932, ch. 368, p. 727 (Michie's Code of 1936, §§2773(24)-2773(79)), further amended the Code by adding to chapter 109-A fifty-six new sections, which permit any county in the State (except those having the county manager form of government under the provisions of the Acts of 1930, ch. 167, p. 450, *supra*) to adopt in a prescribed manner either a "County Executive Form" or a "County Manager Form" of government.

It is said that since the county of Henrico has adopted the "County Manager Form" of government in accordance with the Act of 1932, it is entitled to the benefit of

the provisions of section 2773-1 of the Act of 1930 (Michie's Code of 1936, §2773(21)), and that the city is thereby precluded from annexing any portion of the county's territory unless the whole county be annexed, and then only after the approval of the voters of the county.

The interveners argue that a reading of the 1930 and 1932 Acts together shows a "radical change in the time-honored policy of Virginia in favor of annexation" as laid down in the former statutes on the subject, the effect of which is to relieve counties which have adopted the new form of government "from the danger of piece-meal annexation."

The members of the trial court unanimously overruled this motion to dismiss, and properly so in our opinion. Section 2773-a of the 1930 Act (Michie's Code of 1936, §2773(10)) expressly limits the application of the provisions of the act "to any county having a population of five hundred inhabitants or more to the square mile, as shown by the last United States census." It is conceded that the act was designed to apply only to Arlington county, and this is confirmed by the fact that it had its origin in House Bill 342, which was introduced in the House of Delegates by the representative from that county. This limitation, of course, applies to every section in the 1930 Act. Therefore, when section 2773-1 provides that, "When a county has once adopted one of the forms of government provided for in this chapter, thereafter no part of its territory may be annexed by any city," etc., the application of this provision is limited to a county having the prescribed density in population and concededly does not apply to Henrico county.

The 1932 Act was the result of the "Report of the Commission on County Government to the General Assembly of Virginia," which is printed as "Senate Document No. 3" in the Senate Journal of that year. Attached to this report is a draft of a proposed bill which was adopted by the General Assembly without substantial

change and embodied in the 1932 Act now under discussion.

This act is general in its scope and permits any county in Virginia, except those which have adopted the "county manager form of government" under the 1930 Act, to adopt either the "County Executive Form" or the "County Manager Form" of government in the manner therein prescribed.

It is significant that neither in the act itself nor in the comprehensive report on which it is based, is there any mention of the subject of annexation.

While the purpose of the two acts is to amend chapter 109-A of the Code by adding thereto a number of sections, it is manifest that the framers of the 1932 Act intended that all of the provisions of the 1930 Act should remain applicable only "to any county having a population of five hundred inhabitants or more to the square mile."

To adopt the argument of the interveners and construe the two successive acts as one integrated chapter of the Code, dealing with one subject matter, would result in all sorts of confusing inconsistencies, some of which we may point out:

We would have a single integrate statute, all sections of which would apply at one and the same time to Arlington county alone, under section 2773-a of the Act of 1930, and to all counties in Virginia, except Arlington county, under section 2773-n 1 of the 1932 Act.

The 1932 Act, if intended to be construed along with the 1930 Act, should supplement the earlier act. Instead it parallels it with differences.

In the 1930 Act the referendum to be held on the question of adopting one of the prescribed forms of government is to be initiated by a petition to the circuit court of the county, signed by two hundred or more qualified voters (section 2773-n). Under the 1932 Act the referendum must be started by a similar petition, signed by ten per cent of the qualified voters of the county, which in

no event shall be less than one hundred (section 2773-n 2).

The 1932 Act requires newspaper publication and posting of notice of the election (section 2773-n 2). The 1930 Act has no such requirement (section 2773-n).

The alternate forms of government permitted by the 1930 Act are styled the "Modified Commission Plan" and the "County Manager Plan." In the 1932 Act the alternate forms of government are designated as the "County Executive Form" and "County Manager Form." The four plans or forms are entirely different. The two permitted by the earlier act are comparatively simple in structure. The entire act consists of only fourteen sections. The two forms permitted by the later act are quite elaborate, as is evidenced by the fact that this act contains fifty-six sections. There are other differences which we need not take time to point out.

All of these things, we think, point unerringly to the conclusion that the General Assembly, in the two acts, was dealing with separate but kindred subjects, the 1930 Act applying to one county only, and the 1932 Act applying to the remaining counties.

To adopt the view of the interveners would lead to even more serious consequences. Suppose Augusta county, one of the largest in the State, were to adopt one of the forms of government prescribed in the 1932 Act, then the city of Staunton could enlarge its boundaries only by annexing that county as a whole. Suppose Pittsylvania county should adopt a similar form of government under this act, could the Legislature have intended that the city of Danville, the population of which increased nearly 50% in the last ten years, may expand only by annexing the whole of that county?

Suppose all of the counties in the State should adopt one of the prescribed forms of government under the 1932 Act, could the General Assembly have intended that then all cities in the State would be frozen in their limits and denied the right of expansion by reason of the imposition of terms impossible to be performed?

In *Board of Supervisors of Norfolk County* v. *Duke,* 113 Va. 94, 99, 73 S. E. 456, this court, speaking through Judge Keith, said: "In passing section 1014-a (of Pollard's Code of 1904, Michie's Code of 1936, §§2956*ff*) the legislature was obeying the mandate of the Constitution, which requires it to 'provide by general laws for the extension and contraction, from time to time, of the corporate limits of cities and towns, and no special act for such purpose shall be valid.' " (Constitution, §126.)

If we adopt the argument of these interveners we would be met with the question as to whether the imposition of such restrictions on the expansion of the boundaries of cities was a compliance with this constitutional mandate or in contravention thereof.

But this question we do not have to decide, for it is inconceivable to us that the General Assembly would have effected so radical a change in its settled policy of annexation by mere implication,—by placing these two acts in the same chapter of the Code and thereby incorporating by inference into the 1932 Act this restriction found in the 1930 Act and concededly designed to apply to the situation in Arlington county alone.

The logical and reasonable place to find an indication of such a radical change in the legislative policy would, of course, be in an appropriate amendment to the annexation statutes themselves (Code, §§2956*ff*). There no such change is indicated.

While it is, of course, not controlling, it is significant that the learned and diligent counsel for the county itself did not see fit either in the court below or in the argument before us to join in this contention of the interveners.

In our opinion, the trial court was correct in holding that section 2773-1 of the Act of 1930 and all other provisions of that act were intended to apply only to a "county having a population of five hundred inhabitants or more to the square mile" as shown by the designated census.

Certain other interveners assign as error the failure of the lower court to dismiss the proceeding on the ground that Code, §§2956*ff*, under which it was instituted, have no application to "Henrico county under its present form of government," which, they say, "is now different from a county and is in fact a municipality."

Here the argument is that section 110 of the Constitution, as amended in 1928, permits the General Assembly to "provide for complete forms of county organization and government different from that" theretofore provided for in the Constitution, that such enabling act was passed by the General Assembly in 1932 (Acts 1932, ch. 368, p. 727; Michie's Code of 1936, §§2773(24)*ff*, *supra*), and that Henrico county has adopted in the prescribed manner a new form of government, the effect of which was to change the county into a municipality. Hence, these interveners say, Code, §§2956*ff*, providing for the annexation by a city or town of adjacent territory in a *county*, does not authorize the present proceeding, and that, in fact, the General Assembly has failed to provide a method of annexing territory in a county which has adopted the form of government authorized by the 1932 Act.

The county itself has refrained from joining in this motion to dismiss and in this assignment of error.

■ ■ The Constitution of 1902 recognizes three well-defined classes of subdivisions of the State, namely, counties, cities and towns. Article VII (§§110 to 115, both inclusive) deals with the organization and government of counties. Article VIII (§§116 to 128, both inclusive) deals with the organization and government of cities and towns. These clearly defined subdivisions are still retained and recognized in the Constitution as amended in 1928. Although section 110 of Article VII was amended so as to enable the General Assembly to provide for a change in the form of the "county organization and government," there is nothing in the language of this section to indicate a purpose to change a

county which may adopt such new form of organization and government into a municipality. On the contrary, Article VII, as revised (§§110 to 115-a, both inclusive), still deals with the organization and government of counties, while Article VIII, as revised (§§116 to 127, both inclusive), deals with the organization and government of cities and towns.

■ ■ Therefore, there is no basis for the contention that the adoption by a county of a revised form of organization and government *ipso facto* changes it into a municipality.

This was expressly recognized by this court in *Smith v. Kelley*, 162 Va. 645, 650, 174 S. E. 842, in which we held that while the Acts of 1930, ch. 167, p. 450 (Michie's Code of 1936, §§2773(10)*ff*), under which Arlington county had reorganized its government, had "greatly enlarged the powers, duties and responsibilities of the counties," the fundamental distinction between municipal corporations and counties had been retained.

Moreover, as we have heretofore pointed out, the Acts of 1930, ch. 167, p. 450 (Michie's Code of 1936, §§2773(10)*ff*), under which the government of Arlington county was reorganized, placed a limitation on the manner in which any portion of its territory might be annexed (section 2773-l, Acts 1930, at page 455; Michie's Code of 1936, §2773(21)), while the general act of 1932, under which the present Henrico county government was organized, is silent upon the subject of annexation. This indicates, as we have heretofore said, that the general annexation statutes (Code, §§2956*ff*) are still applicable to a proceeding brought to annex territory in Henrico county.

Having concluded that the trial court correctly overruled the several motions to dismiss, we turn next to the merits of the controversy.

The county's principal assignment of error, in which the interveners join, is that the court's finding that it is necessary and expedient for the city to annex the terri-

tory described in the final order is without evidence to support it, and is, in fact, contrary to the evidence which affirmatively shows that such annexation is not necessary and expedient.

Closely related to this assignment are the further assignments which we shall discuss in connection therewith, namely: That Henrico county is more adequately capable of rendering the necessary governmental functions and performing the necessary public services for the residents in the annexed territory than is the city of Richmond; that the city is financially unable to perform its promises made to the annexed territory in the pre-annexation ordinance; and that in ordering the annexation of the territory the court failed to give due consideration to the interests of the State, the county, the annexed area, and the "freeholders" and "voters" in such area.

In approaching a consideration of this assignment the county contends that the case should be determined *de novo* by this court upon the consideration of the whole record.

On the other hand, the city contends that it is in the position of a successful litigant in a chancery appeal which has been heard *ore tenus* by the lower court, that the finding of the trial court is in the nature of a jury's verdict and should not be disturbed unless there is a lack of evidence to support it.

Code, §2961, provides that an appeal in an annexation proceeding "shall be heard and determined without reference to the principles of demurrer to evidence—the evidnce to be considered as an appeal in chancery cases, * * * "

In considering this statute this court said in *County of Norfolk* v. *City of Portsmouth,* 124 Va. 639, 644, 98 S. E. 755: "And the statute law on the subject having made special and eminently fair and just provisions for the constitution of the trial courts, and such courts having peculiar opportunities to ascertain the

very right of the case, by a view of the *locus in quo,* and by the examination of witnesses in the presence of the court, their conclusions and decisions on matters of fact are not to be disturbed unless plainly wrong, notwithstanding the provision of the statute that an appeal in such cases shall be heard 'without reference to the principles of demurrer to evidence; the evidence to be considered as on appeal in chancery cases.' * * *' And while the appellate court, under the statute last quoted, will not disregard any of the evidence or inferences which may properly be drawn therefrom, but will consider all of the evidence in the record, yet, in such court, a certain presumption of correctness will attend the decision by the court below of such questions of fact, which is greater than would adhere to it if based on testimony not delivered in the presence of the trial judge.''

Since that opinion this court has held in a number of cases that a decree in a chancery cause appealed from, upon a conflict of the evidence heard in open court, has the same weight as the verdict of a jury and is binding on us unless it is plainly wrong or without evidence to support it. *Hartman* v. *Melfa Banking Co.,* 162 Va. 433, 436, 174 S. E. 653; *Howren* v. *Howren,* 164 ,Va. 141, 143, 178 S. E. 678, 679; *Williamson* v. *Johnson,* 164 Va. 632, 637, 180 S. E. 310, 312; *Planters Nat. Bank of Fredericksburg* v. *E. G. Heflin Co.,* 166 Va. 166, 172, 184 S. E. 216, 218; *Allen* v. *Allen,* 166 Va. 303, 304, 186 S. E. 17; *Morison* v. *Dominion Nat. Bank,* 169 Va. 191, 204, 192 S. E. 707, 712.

As we said in *Planters Nat. Bank of Fredericksburg* v. *E. G. Heflin Co., supra* (166 Va., at page 172, 184 S. E., at page 218): ''If there is credible evidence to support the chancellor's judgment we must accept it, just as we must accept a jury's verdict sustained by evidence which it might have believed.''

For, ''If we consider testimony *de novo* we would sit as a court of original jurisdiction and not as one of appeal.'' *Planters Nat. Bank of Fredericksburg* v. *E. G.*

*Heflin Co., supra* (166 Va., at page 174, 184 S. E., at page 219).

These principles apply here. The trial court heard the testimony of numerous witnesses, observed their demeanor upon the stand, examined and had explained to it a great number of exhibits introduced, and made personal inspections of the territory to be annexed. All questions of fact having been decided by a majority of the trial court, its findings of fact should not be disturbed by us unless there is a lack of evidence to support such findings. Code, §2958 (as amended by Acts 1920, ch. 149, p. 210; Acts 1924, ch. 441, p. 663; Acts 1928, ch. 412, p. 1076), provides, *inter alia,* that "if the *majority of the court* shall be satisfied of the necessity for and expediency of such annexation, * * * an order shall be entered providing for the annexation of such territory." (Italics supplied.) A unanimous decision on such question is not required.

The principles to be applied in interpreting annexation statutes are well settled. In *Henrico County* v. *City of Richmond,* 106 Va. 282, 294-295, 55 S. E. 683, 117 Am. St. Rep. 1001, it was said: "The necessity for or expediency of enlargement [of the boundaries of a city or town] is determined by the health of the community, its size, its crowded condition, its past growth, and the need in the reasonably near future for development and expansion. These are matters of fact, and when they so exist as to satisfy the judicial mind of the necessity for or expediency of annexation, then, in accordance with the provisions of the act, the same must be declared."

In *City Council of Alexandria* v. *Alexandria County,* 117 Va. 230, 84 S. E. 630, the court stressed the community of interest between residents of the city and residents of the territory proposed to be annexed, and the fact that their commercial, civic and social interests were identical. See also, *County of Norfolk* v. *City of Portsmouth,* 124 Va. 639, 653, 98 S. E. 755.

In *Warwick County* v. *City of Newport News,* 120 Va. 177, 193, 90 S. E. 644, it was pointed out that the proposal for annexation must be considered "from the viewpoint of the State, the city, the county and the territory to be annexed." See also, *County of Norfolk* v. *City of Portsmouth, supra* (124 Va., at page 643).

In *Warwick County* v. *City of Newport News, supra*, it was pointed out that increasing the revenue of a city was not a ground of itself justifying annexation, nor was the loss of revenue by the county from which the territory was to be detached a defense to the proceeding.

All of these principles were collected and applied in the opinion in *City of Lynchburg* v. *County of Campbell, et al* (1925), 11 Va. Law Register (N. S.) 400, written for the lower court by Judge C. Vernon Spratley, now a justice of this court. That case, in which no appeal was taken, involved many of the questions which are before us here, and that opinion is strikingly informative on the matters with which we are concerned.

In the case at bar the separate opinions of the three distinguished judges who constituted the trial court below, show that all of the principles to which we have adverted were carefully considered, the majority of the court being of opinion that an application of these principles to the facts necessitated an order in favor of annexation, while one of the judges was of opinion that the city had not made out a case.

In our opinion there is ample evidence to support the findings of the majority of the court.

The original city of Richmond, having a population of 250 inhabitants and an area of two-tenths of a square mile, was situated on the north bank of the James River at the falls. By nine successive annexations its territory has been expanded to an area of 22.99 square miles, with a population of 182,929 in 1930. Due no doubt to the topography of the area in and surrounding the city, the expansion has been largely to the north and west

and into Henrico county, although in 1910 the town of Manchester, in Chesterfield county, south of the river, was annexed, and in 1914 there was a further expansion in this direction.

With the advent of cheaper motor transportation and the desire of people for larger building lots with more light and air, the inhabitants of a large city are no longer content to build their homes in congested area. Consequently, if suitable locations are not available in the city, the population inevitably spreads beyond the city limits into the surrounding country. This has been Richmond's experience.

The evidence clearly shows that there is a decided lack of desirable residential sites in the city. True it is that there are areas not built upon, but the taste of one suited to a site in Windsor Farms is not satisfied with a location on Shockoe Creek.

Thus we find from the record that while approximately 180,000 people lived within the city in 1930, some 19,000 more lived just beyond the city limits in Henrico county. Experts on behalf of the city estimate that by 1960 the number of those living beyond the city limits, but adjacent thereto, will exceed 36,000.

It is estimated that 80% of the suburbanites who earn a living are employed or earn their livelihood in the city. Even a larger per cent of these market and shop there, use its streets and the facilities furnished by its public utilities. That the city is the center of the commercial, civic and social life of these people cannot be questioned. As is said in the city attorney's brief, "How long would the Westhampton community continue to exist if the city of Richmond were moved fifty miles down the James River?" To ask this question is to answer it.

Aside from the congested condition in the city, which is amply shown in the record, it is manifest that the identity of community interests of those living within the city and those living in the area proposed to be annexed demand a unified central administration for the

whole urban area. It stands to reason that the combined resources of the inhabitants of the city and of the annexed territory should result in better facilities for the territory as a whole, and the evidence on behalf of the city bears this out.

The city has developed a complete and adequate system of sanitary and storm water sewers for its entire area, with outfalls into the James River. It has been designed and constructed to dispose of all sewage and a large portion of the storm water originating in the urban community beyond its boundaries, and is capable of doing so efficiently and economically.

At the time of the adoption of the pre-annexation ordinance by the city in February, 1938, the county had provided no sewerage facilities for any of its urban communities. Parcels "A," "G" and "H" to the southeast of the city had no sewer connections at all. In Parcels "B," "C," "D" and "E" there were sewers which discharged through the city system into the James River.

In the latter part of 1938, Sanitary District No. 1, which comprises a portion of Parcel "E," authorized a bond issue for the construction of a sewage disposal plant. This project was in the course of construction at the time of the hearing below. As we understand it, the sewage is to be pumped from Parcel "E" through a main extending in a northeasterly direction to a disposal plant located on the southern side of Upham Brook, between U. S. Highways Nos. 1 and 2 north of the city. This plant it to drain into Upham Brook and into Chickahominy River to the northeast of the city. It is also contemplated that the project will serve the territory comprised in Sanitary District No. 5, which lies to the north of the city west of U. S. Highway No. 2. Sanitary District No. 5 covers a part of Parcel "D."

There is a mass of technical evidence in the record as to the feasibility of the operation of this project at an economical cost. The city's witnesses point out that this method of disposal will necessitate the pumping of

the sewage from Parcel "E" up to a considerable elevation, and, furthermore, that the flow of water in Chickahominy River is not sufficient to properly take care of the system.

But aside from this, the proposed plan is by no means an adequate disposal system for the territory proposed to be annexed. No provision is made for sewerage in Windsor Farms, Rothesay, Westmoreland Place, Hill Crest, Paxton, Grove Avenue Crest and Hampton Hills in Parcel "E". Apparently this territory, the greater portion of Parcel "D," and all of Parcels "A," "B," "C," "G" and "H," to the east of the city, are to be left to be served by the city system, if, indeed, any service is to be provided.

We think the city's evidence demonstrates that it is far better equipped to furnish adequate sewerage facilities to the territory proposed to be annexed and at a less cost than the county.

At present the annexed territory is almost entirely dependent upon the city for its water supply. The record clearly shows that the city is in a position to furnish this territory with an abundant supply of pure water. It is true that the county has under consideration a plan to furnish water to a portion of the territory. But the majority of the trial court was not convinced of the feasibility of the plan, stating that the proposed water sheds were too small to guarantee a constant supply of necessary pure fresh water.

The city provides to its inhabitants a system of orderly and controlled collection and disposal of garbage and trash. No such facilities are furnished by the county. Trash is collected once a year, and county residents are entirely dependent upon their own devices and uncontrolled private scavengers for the collection and disposal of garbage and trash.

While the county furnishes some measure of fire protection, it cannot be compared with that furnished by the city to its residents.

After hearing the conflicting testimony on the subject, the majority of the trial court likewise found that, "The facilities of the city of Richmond for a safer and better sanitary and police service, for schools and fire protection, and for safeguarding the health of the people are unquestionably superior to the facilities now in the territory proposed to be annexed."

The city is in a position to furnish the annexed territory adequate lights for its roads and streets. The county furnishes none. The same is true of parks and recreational facilities.

Much emphasis is laid in the county's brief on the opposition to annexation on the part of a number of freeholders and qualified voters in the annexed parcels.

It is true that some 2,800 of these signed petitions objecting to the annexation. It is significant that nearly all of these objectors reside in Parcel "E," which is populated by the wealthier residents of the county, most of whom earn their livelihood in the city and are prominent in its commercial, professional and social life. It may be noted, too, in passing that the territory in which these objectors live is that to be served by the proposed sewerage and water plants which the county is constructing or contemplating constructing. Little objection seems to come from the less fortunate inhabitants in the other areas which are proposed to be annexed to the north, east and southeast of the city.

Although the proposed annexation removes from the county some of its heaviest tax values, the residents of the county who live outside the annexed parcels, with the exception of the county officials, are not protesting. The city's brief states, and we take it to be conceded, that, "Not a citizen of the county outside of the parcels decreed to be annexed intervened in the case to oppose annexation or even testified in opposition."

Moreover, it is no answer to an annexation proceeding to assert that individual residents of the county do not need or desire the governmental services ren-

dered by the city. A county resident may be willing to take a chance on police, fire and health protection, and even tolerate the inadequacy of sewerage, water and garbage service. As long as he lives in an isolated situation his desire for lesser services and cheaper government may be acquiesced in with complacency, but when the movement of population has made him a part of a compact urban community, his individual preferences can no longer be permitted to prevail. It is not so much that *he* needs the city government as it is that the area in which he lives needs it.

The county lays great stress on the fact that it has adopted a modern and "streamlined" form of government, while, it says, the city adheres to an "outmoded, fossilized, bicameral councilmanic form." But this is no answer to the annexation proceeding. Certainly, we think, there is ample evidence in the record to sustain the city's contention that regardless of its form of government it is financially able to furnish the improvements and to perform the services in the annexed territory which are promised in the pre-annexation ordinance.

It is true, as the county contends, that the proposed annexation will result in considerable loss of revenue to the county. That situation exists in every annexation proceeding. *Warwick County* v. *City of Newport News, supra* (120 Va., at page 193). In a measure, at least, the county is compensated therefor by the terms of the annexation order. Moreover, as Judge Spratley pointed out in *City of Lynchburg* v. *County of Campbell, et al., supra* (11 Va. Law Register (N. S.), p. 406), "Annexation as experience has proven will stimulate the growth of the county and districts immediately adjacent to the new lines, and in a short time the increased county and districts values will provide to a great extent for the present loss of revenue suffered in these proceedings."

Finally, as to the interest of the State. In *Warwick County* v. *City of Newport News, supra* (120 Va.,

at page 193), we said: " 'The interest of the State lies along the line which promises the great(est) develop-ment.' "

It cannot be seriously questioned that that "which promises the greatest development" of both the city and the territory sought to be annexed is the combination of the resources of this great urban community under a single political unit as contrasted with their continued separation under competing units. This the city's evi-dence clearly shows.

On the whole our conclusion is that there is ample evi-dence in the record to support the finding of the lower court as to the expediency and necessity of annexing the territory described in the order appealed from.

Shortly after the evidence had been concluded the lower court announced its decision on the question of annex-ation. It announced that Parcel "E," as described in the pre-annexation ordinance, among others, should be in-cluded in the territory to be annexed. This included 92.77% of the territory in Sanitary District No. 1, but excluded the greater portion of the property of the Country Club of Virginia, a development just to the north thereof, both of which are in Sanitary District No. 1, and the property of the University of Richmond just to the north and west of this development.

After the decision had been announced, the Univer-sity of Richmond appeared before the court and asked that its property be included in the annexed territory. Since the university's property is not subject to taxation the county did not vigorously oppose this request.

While the city indicated its willingness to have the university's property included in the annexed territory, it did so only upon the condition that the remainder of Sanitary District No. 1 be also included,—that is, that the entire property of the Country Club of Virginia and the development lying between it and the University of Richmond be likewise included. It argued that this latter territory should be included in order to comply with the

statutory requirement that the annexation lines shall embrace "a reasonably compact body of land" (Code, §2958, as amended).

Judge Barksdale was of opinion that this request of the city should be granted. The view of the majority of the court was to include the property of the University of Richmond and a portion of the development lying between it and the Three Chopt road to the east. It declined to include the major portion of the property of the Country Club of Virginia and the greater portion of the development to the north thereof, which embraces the remaining 7.23% of the territory in Sanitary District No. 1.

In our opinion the request of the city for the annexation of the remaining portion of Sanitary District No. 1 should have been granted by the trial court. In the first place, the inclusion of this additional territory is necessary in order to comply with the statute as to the reasonable compactness of the body of land to be annexed. In addition to this, a number of witnesses for the city testified as to the expediency and necessity of the annexation of this territory, despite the fact that it was not included in Parcel "E" as described in the pre-annexation ordinance.

It is undisputed that this territory (with the exception of the property of the Country Club) is entirely dependent upon the city for its water supply and sewerage. The annexation order recognizes this, for it imposes upon the city the obligation of continuing to furnish water to that territory during the term of the current contract. The record also discloses that this contract may be terminated on December 31, 1941, by giving six months' notice. Apparently no provision has been made for furnishing water to this territory if the city should decide to terminate the contract.

Moreover, over the objection of the city, the annexation order requires it to continue to take and dispose of the sewage through its mains from this excluded portion

of Sanitary District No. 1 for an indefinite period. If the city must furnish such service to this area, then logically the territory should be under its control.

On the other hand, unless the territory is to receive water and sewerage service from the city, it is difficult to see how this small fraction of the present sanitary district can afford to render such service.

The Country Club of Virginia insists that its property in Sanitary District No. 1 should be excluded from the territory to be annexed. This consist of 142.2 acres, on which is located an 18-hole golf course, a small golf course, a number of tennis courts, a swimming pool, and a handsome club building. It is bounded on the south by the River road, on the east by the Three Chopt road, and on the north by St. Andrews Lane and Ridgeway road. Its western line coincides with the western line of Sanitary District No. 1. The annexation order added to the city a strip of this property 250 feet deep bordering on the western side of Three Chopt road.

The club argues that none of its property should be included in the annexed territory; that no part of its land is "susceptible of urban development;" and that annexation will result in a ruinous increase in the amount of its taxes without any benefit whatsoever to it.

A glance at the map shows that in order to insure the annexation of "a reasonably compact body of land," this property should be included. There is no natural boundary between this and the other territory in Sanitary District No. 1.

The club is partly dependent upon the sanitary district for water and sewerage. While it is equipped with an automatic sprinkler system, it is unquestionably dependent upon the city for fire protection in case of serious trouble. It is likewise dependent upon the city for police protection in case of serious difficulty.

That the club is an asset to the city no one will question, but it is also true that the city is its main asset, for the record shows that it is largely supported by the

residents of the city and of the territory to be annexed. While annexation will no doubt result in an increase of its taxes, there is no basis, we think, for the contention that this will be "ruinous."

We likewise find no basis for the contention that the club's land is not "susceptible of urban development." Certainly there is nothing to indicate that there is any material difference in the topography of its land and the fully developed suburb between the club and the grounds of the University of Richmond, a part of which the court saw fit to include in the territory to be added to the city.

In our opinion the annexation order should be modified to include the remaining territory in Sanitary District No. 1.

Since the whole of Sanitary District No. 1 is to be annexed, it is not necessary that we discuss the city's contention that the annexation order improperly compelled it to furnish water and sewerage to all of that territory.

The county complains of the action of the trial court in declining to require the city to pay it the sum of $569,-828.45, representing the present value of certain roads and streets in the annexed territory. This claim consists of three items: $205,021.41 representing the value of roads and streets in Windsor Farms and Westmoreland Place, which were constructed by the developers of these properties and subsequently taken over by the county in 1936 without cost to it upon the agreement to maintain them; $42,412.37 representing the value of roads constructed principally by other subdividers but partly by the county out of gasoline taxes allocated to it by the State; and $322,394.67 representing the value of roads constructed by the county's road forces and paid for partly from county levies, partly from State aid road funds, and partly from gasoline taxes collected by the State and allocated to the county under various acts of the General Assembly. At the time of the annexation all of these roads were being maintained—that is,

kept in condition—by the county out of State gasoline taxes allocated to the country under the Acts of 1932, ch. 415, p. 872 (as amended by Acts 1936, ch. 384, p. 614; Michie's Code of 1936, §§1975hh, *et seq.*)

The majority of the trial court held that under a proper interpretation of Code, §2958, as amended, the city should not be required to pay the county for the present value of the roads in any of the three classifications.

So much of Code, §2958, as amended, as is here material, reads as follows:

" * * * In every case of annexation, such city or town shall assume and provide for the reimbursement of the county or counties for such just proportion of any existing debt of such county or counties or districts therein, and for the then value of such permanent public improvements as may have been made in the territory annexed, either by way of macadamizing public roads or streets, or by way of the construction of concrete roads or streets, or otherwise permanently improving roads or streets, or by constructing concrete sidewalks on public roads or streets, or by constructing or laying water mains or sewers, garbage disposal system, fire protection facilities, bridges or any other permanent public improvement, constructed and maintained by such county or counties at the time of annexation, as may be determined by the court in the proceeding in the determination of which value the court shall take into consideration the value of such public improvements to the city or town seeking annexation as well as the county or counties affected thereby; provided, the cost of such public improvements is not embraced in the proportion of the debt of such county or counties, or district therein, which is assumed and provided for by such city or town in said proceeding; * * * . And such city or town shall also provide for the compensation to such county or counties for the then value of any schoolhouse or other public building of such county located within the an-

nexed territory, which shall not be reserved to the county in the proceeding; * * * ."

In our opinion the provision in the statute "for the reimbursement of the county * * * for the then value" of roads and streets "constructed and maintained by such county * * * at the time of annexation," is designed to restore to the county money raised from its taxpayers through county levies and spent in the construction and maintenance of such roads and streets, such repayment, however, not to exceed the present value of such improvements. Stated conversely, the provision is not intended to require the city to pay the county for the value of roads or streets which have cost the taxpayers of the county nothing.

The interpretation of this provision was before the court in *City of Lynchburg* v. *County of Campbell, et al., supra,* which dealt with the question as to whether the city should be required to pay the county for the value of certain roads and streets in the annexed territory, some of which had been constructed by the developers of the property, some partly out of county levies, and all of which had prior to the annexation proceedings, been taken over and were then being maintained and operated as a part of the State highway system at the expense of the State. In the well-reasoned opinion, written by Judge Spratley, the court declined to following the argument of the county (likewise made in this case) that the word "reimbursement" in the statute was synonymous with "compensation." The opinion says (11 Va. Law Register (N. S.), at page 404):

" * * * It seems to the court that the word 'reimbursement' was advisedly used by the Legislature in the first part of the section instead of the word 'compensation' as used and applied to schoolhouses and public buildings. Reimbursement is, therefore, construed by this court in its primary meaning to mean to secure a return or restoration of an equivalent for something paid or expended; reimbursement means refunding or repayment." (Citing authorities.)

Continuing, the opinion says (11 Va. Law Register (N. S.), at page 404): "The words 'constructed and maintained at the time of annexation' qualify and are applicable to all the classes of improvements mentioned immediately prior thereto for which reimbursement is to be made, and the quantum of the payment is determined by the word 'reimbursement' at the then existing value. The two words 'constructed and maintained' are used in the conjunctive and should be given their plain and simple meaning,—that is that the public improvements for which reimbursement is given should be those constructed by the county and maintained by it at the time of this proceeding. It is contended that the use of the proviso that the city shall receive credit for such sum as it may have contributed to such public improvement excludes the allowance of any other credit, such as improvements made at individual or private corporate expense. This construction the court cannot follow."

The opinion concludes its reasoning on this phase of the case with this language (11 Va. Law Register (N. S.), at page 405): "Having determined that reimbursement is to be the measure of compensation for permanent public improvements and that only those can be considered which were constructed and maintained by the county at the time of annexation, it follows that this court can not allow reimbursement for public improvements not originally constructed by the county out of its funds, nor for [such] public improvements as are not at the time of annexation being maintained by it."

When these principles, with which we agree, are applied to the situation before us, we have no hesitation in saying that the lower court correctly held that the county was not entitled to recover the items involved in this assignment of error.

As has been stated, the roads and streets in Windsor Farms and Westmoreland Place were constructed by the developers of these properties, were taken over by the county in 1936, and have been maintained by it out of

gasoline taxes collected by the State and allocated to the county. These improvements have cost the taxpayers of the county nothing either for the original construction or. subsequent upkeep.

The county argues that the funds which have been allocated to it by the State, either out of its general revenues or out of its collections from gasoline taxes, for road construction and maintenance, upon such allocation became "county funds" for which the county is entitled to reimbursement. It points out that when the State took over the construction and maintenance of all county roads by the Acts of 1932, ch. 415, p. 872, *supra,* the county of Henrico elected, in the manner prescribed by the statute, to exempt itself from the provisions of the act and to retain jurisdiction of such of its roads as are not embraced in the primary highway system of the State. This is true. But it is also true that under the provisions of the 1932 Act, where a county, such as Henrico, elected not to surrender the jurisdiction of its county roads to the State, its taxpayers were nevertheless relieved from all cost of the construction and maintenance of such roads by the allocation to it by the State of a substantial amount out of the gasoline taxes collected by the State. These funds are required to be used exclusively for road construction and maintenance and cannot, like county levies, be used for other purposes. Consequently, since the 1932 Act, the county of Henrico has made no county levy on its taxpayers for the cost of construction or maintenance of its roads. This has been entirely accomplished through the funds which have been allocated to it by the State.

The manifest purpose of the 1932 Act was to relieve the county taxpayers of the cost of the construction and maintenance of the county roads. In all of the counties, except Henrico, these roads are constructed and maintained by the State Highway Department. In Henrico county, while the county officials have charge of the construction and maintenance of the roads and the ex-

penditure of the funds therefor, these funds are raised by the State and are allocated to the county. The taxpayers of Henrico county are relieved of all cost of constructing and maintaining the roads just as are the other counties in the State. Therefore, to require the city of Richmond to pay to the county of Henrico the value of the roads which have been constructed and are being maintained out of funds allocated to the county by the State, is to require the city to pay the county for the value of roads which have cost the taxpayers of the county nothing. In our opinion the county is no more entitled to be reimbursed for the value of the roads built out of money furnished by the State than it is to be reimbursed for roads built by private persons, such as the developers of the property.

It may be noted in passing that the county makes no claim that the city should reimburse it for any part of the funds contributed by the Federal government to the cost of the construction of the sewer in Sanitary District No. 1, although Code, §2958, as amended, places sewers in the same category as roads and streets, for which the county is entitled to "reimbursement." With respect to the right to reimbursement, there is no difference between funds contributed by the Federal government and those contributed by the State government.

While the record shows that in past years some county levies have gone into the cost of the construction and maintenance of some of the roads in the annexed territory, no effort has been made before us to show the amount of these funds or what proportion of the present value of the improvements is due to them. Indeed, the county makes no claim to reimbursement for that part of the value of the improvements created by the county levies as distinguished from that part of the value which has been created by State funds.

The city assigns cross-error to the action of the lower court in requiring it to reimburse the county for the present value of the extension of Grove avenue into the

annexed territory. The evidence shows that this road was originally constructed by the county out of the proceeds of a bond issue, but has recently been kept in condition by the county out of gasoline tax allocations. The city argues that in order to entitle the county to reimbursement, the road must have been constructed by the county out of its funds and must have been "maintained * * * at the time of annexation" by the county from the same source, and that the latter requirement is lacking.

■■ We think this places too narrow an interpretation on the statute. As we have heretofore said, its purpose is to reimburse the taxpayers of the county for the then value of the roads which have been constructed with their money. The word "maintained," as here used, has a broader meaning than merely "kept in repair." It is intended to apply to a road which is a part of the county system at the time of annexation as distinguished from one which may have been abandoned or closed. Manifestly it would be inequitable to require the city to reimburse the county for the value of a road which the latter may have built and later abandoned. But, on the other hand, it would be equally unfair to the taxpayers of the county to deny them reimbursement for the value of a road which they have constructed out of their own moneys and which is available for use by the city as one of its principal streets in the annexed territory.

The county claims that the lower court failed to adequately compensate it for the value of the land on which the Brook Hill school is located. The court allowed approximately $26,000 for this property, which is in accordance with the testimony of the county's witnesses if the present zoning of the property is to be restricted to residential purposes. But the county contends that due to the advantageous location of this property on Chamberlayne avenue, which leads into U. S. Highway No. 2 proceeding to Washington, the land has a prospective increase in value of $6,000, provided it is rezoned

for business purposes. Therefore, it says, it should have been allowed this additional sum.

Code, §2958, as amended, provides that the city shall "provide for the compensation to such county or counties for the then value of any schoolhouse or other public building of such county located within the annexed territory, which shall not be reserved to the county in the proceeding; * * * ."

It will be observed that the compensation is to be fixed at "the then value" of the property,—that is, the value at the time of the annexation. The additional value for which the county contends depends entirely upon the happening of a future event, namely, the rezoning of the property, which may or may not take place. Such increase in value is entirely speculative and was, we think, properly disallowed.

The county next contends that the lower court failed to require the city to adequately compensate it for the injury to the value and the impairment of the use of Montrose school. Code, §2958, as amended, requires the city to compensate the county "for any injury to the value or the impairment of the use of the county of any schoolhouse therein by reason of the annexation."

The Montrose school is located on Route No. 60 (the Williamsburg road), about a mile east of the northeastern boundary of Parcel "H" in the annexed territory. The county claims that by reason of the annexation the school will lose 176 of its 269 pupils, which will result in a 60% impairment of the use of the school to the county. Therefore, it claimed damages in the sum of $21,900, which is 60% of the present value of the building and equipment. The lower court allowed $15,000 to the county for this item. The county contends that this award should be increased by the sum of $6,900, while the city, in a cross-assignment of error, contends that no allowance whatsoever should have been made to the county on its claim.

There is testimony in the record that this school is overcrowded and that the transfer of pupils in the annexed territory to the city system will relieve that condition. No doubt, too, the court took into consideration the fact that the county, through its transportation system for school children, can make use of this school and relieve congestion in other quarters.

In the light of the conflicting testimony, we cannot say that the action of the lower court was unfair either to the county or to the city.

Code, §2958, as amended, further provides that a city which annexes a part of the territory of a county "shall assume and provide for the reimbursement of the county or counties for such just proportion of any existing debt of such county or counties or districts therein, * * * as may be determined by the court in the proceeding * * * ."

The evidence shows that pursuant to the authority of the board of supervisors, the county school board borrowed the sum of $207,000 from the literary fund of the State (Code, §632, as amended by Acts 1928, ch. 471, p. 1195), which, with grants from the Federal government, was used for the construction of school buildings at Glen Echo, Sandston, Varina, Glen Allen, and at the Virginia Randolph high school (colored).

The record also shows that before the entry of the order appealed from the school board had incurred additional debts, amounting to $13,324, for the cost of completing some of these buildings which were in the process of construction at the time of the annexation proceeding. It proposes to fund these by obtaining a further loan from the literary fund.

The lower court required the city to assume 45.79%* of the principal amount of the bonds already issued ($207,000), with interest, but refused to require it to assume any portion of the additional indebtedness of $13,-324 incurred to complete the projects.

---

*This represents the percentage of assessed values of real and personal property which the county will lose through annexation.

The county assigns as error the action of the court in not requiring the city to assume any part of this additional indebtedness, while the city assigns cross-error to the action of the court in requiring it to assume any part of the $207,000 of bonds already issued.

We will first consider the cross-assignment of error of the city, for if its position be well taken and it should not be required to assume any portion of the indebtedness, that will necessarily dispose of the county's assignment of error.

The principal contention of the city is that the indebtedness incurred by the Henrico *county school board* is not a debt of the *county* within the meaning of Code, §2958, as amended. With this contention we cannot agree.

The record discloses that Henrico county is one single county school district. And while the county school board is a body corporate for certain purposes (Code, §653, as amended by Acts 1928, ch. 471, p. 1202; Acts 1930, ch. 412, p. 884; Acts 1932, ch. 117, p. 124; Acts 1936, ch. 314, p. 502; Acts 1938, ch. 318, p. 468), Code, §644 (as amended by Acts 1928, ch. 471, p. 1199; Acts 1938, ch. 46, p. 96), provides that the board of supervisors of counties in which school boards have borrowed from the literary fund, "shall include in the county * * * levy, or levies, or appropriate a fund sufficient, as the case may be, to meet its liabilities on such contract, * * * ." This leaves no room for doubt that the State literary loans are county obligations which must be repaid by county levies laid on a country-wide basis. Indeed, the record shows that the required levies have been laid by the county.

The city next argues that it should not be required to assume any part of this indebtedness because the bonds constitute a specific lien on the schoolhouses, for the erection of which the loan was made (Code, §645, as amended by Acts 1928, ch. 471, p. 1200), and that none of these buildings lie within the territory to be annexed or will become the property of the city.

This, we think, is entirely beside the point. The provision for reimbursement of the county for a "just proportion" of its debt is not conditioned upon the city's acquiring the property for the cost of which the debt was incurred. The manifest purpose of the provision is to reimburse the county for the loss of taxable values which the city acquires as the result of the annexation, and which reduces *pro tanto* the county's ability to discharge its debts.

In our opinion, the lower court was correct in requiring the city to assume the ascertained proportion of the bonds already issued to secure the loan from the literary fund.

The additional indebtedness of $13,324 incurred by the school board for completing the projects is likewise an 'existing debt" of the county within the meaning of Code, §2958, as amended. Pending the funding of the debt by a loan from the literary fund, the county, of course, owes the money to those who have furnished the labor and materials. The 'order appealed from will, therefore, be modified to require the city to assume 45.79% of this additional indebtedness.

The order appealed from requires the city to assume 100% of a total bond issue of $220,000, and certain additional obligations amounting to $5,500, issued and incurred by Sanitary District No. 1 in connection with the construction of the sewer system to which we have referred. It also requires the city to assume 92.77% of obligations incurred by the district in connection with the proposed construction of the water supply system, to which we have likewise referred.

In an assignment of cross-error the city contends that it should not be required to assume more than $40,000 of the amount expended on the sewer system, which, it says, represents the outlay necessary for repairs thereto. It argues that the construction of this sewer system is of no value to the city, which will use its own mains for furnishing sewerage to the annexed territory. The

same argument is made with respect to the obligation incurred in connection with the proposed water supply.

The sanitary district bonds were issued under the Acts of 1932, ch. 186, p. 362 (Michie's Code of 1936, §§1560aa, *et seq.*). Under the terms of this act the net revenue derived from the operation of the system is to be set apart to pay the interest on the bonds and to create a sinking fund to redeem the principal thereof at matturity. In addition to this, the board of supervisors was authorized to "levy an annual tax upon all the property in said district subject to local taxation to pay such interest and to make payments into said sinking fund." (Michie's Code of 1936, §1560gg.) The act contains no provision making the bonds an obligation of the county.

As modified by us, the annexation order will incorporate in the city limits the whole of the sanitary district. Having acquired the district's sources of revenue from which the bonds are to be paid, it is only equitable that the city should assume the payment of these obligations.

That the sewer system may be of no value to the city (assuming that to be true) is immaterial. There is no requirement in Code, §2958, that reimbursement by the city for any proportion of the debt of a county or district is to be conditioned upon the usefulness of the project for which the obligation is incurred.

What we have just said likewise disposes of the city's contention that it should not be required to assume any portion of the obligations incurred in connection with the construction of the proposed water supply system for the district.

The allowance and disallowance of compensation for other relatively small items are complained of by both the city and the county. To review these in detail would unnecessarily prolong this opinion. They involve no important principles and, in our opinion, the correct conclusion was reached by the trial court as to each of them.

The order appealed from provides that the annexation shall "take effect at midnight on the 31st day of December, 1940." In view of the suspension of the order pending this appeal, the order will be amended to provide that it will take effect at midnight on the 31st day of December, 1941. *Warwick County* v. *City of Newport News, supra* (120 Va., at page 202).

Subject to the modifications as herein indicated, the judgment of the circuit court is affirmed.

The city of Richmond having substantially prevailed on this appeal will recover its costs in this court. Code, §2961.

*Modified and affirmed.*