# Richmond

## County of Norfolk v. City of Portsmouth.

November 24, 1947.

Record No. 3241.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Staples, JJ.

The opinion states the case.

*A. O. Lynch, James G. Martin & Sons, W. R. Ashburn* and *Baird, White & Lanning*, for the appellant.

*Robert B. Tunstall, Jos. L. Kelly, Jr.,* and *R. C. Barclay,* for the appellee.

STAPLES, J., delivered the opinion of the court.

By this appeal the County of Norfolk, appellant, seeks the reversal of a decree of the circuit court of that county, directing to be annexed to the City of Portsmouth, appellee, certain lands adjacent to said city and now lying in said county. The case was tried before three judges, as re-

quired by law, Judge Edward L. Oast, of the Norfolk County Circuit Court, Judge F. S. Crosby, of the Circuit Court of Augusta County, and Judge F. E. Kellam, of the Circuit Court of the City of Portsmouth. Judges Crosby and Kellam concurred in the decree appealed from while Judge Oast dissented. Both a majority opinion and a minority one dissenting therefrom were filed. The only questions raised by the assignments of error are whether the circuit court erred in its conclusion (1) that the proposed annexation is necessary and expedient and should be directed by the court, and (2) that annexation Areas No. 1 and No. 2 should be considered, after annexation, as a single unit rather than two separate annexations. Two tracts of land are involved, designated as "Area No. 1" and "Area No. 2", respectively.

Area No. 1 is a residential section and contains about 2000 acres, substantially all of which has been subdivided into lots which have been closely built on. Its streets are improved and hard surfaced. It has a population of about ten thousand, and its real estate is assessed for taxation by the county at over six and one half million dollars.

Area No. 2 is almost entirely industrial, having only about sixty residents. It consists of approximately one thousand acres, of which the greater part is embraced in the Naval Reservation. All of its streets are hard surfaced. The land in this area is almost fully occupied by industrial establishments with relatively little room for additional ones unless they replace some of those now existing. It is situated on the opposite side of the city from the other area.

No complaint is made by appellant with respect to the sufficiency of the services which the city is required to provide under the terms of the annexation ordinance and the court's decree. They call for the installation of modern and adequate sewerage facilities in Area No. 1, including a pumping station, an additional 48 inch pipe line, and a sewage treatment plant. Septic tanks are now used in a

large part of the Westhaven section of this area. The discharge of affluent from the sewers in the Waterview District into the Western Branch is deemed objectionable and it will be conducted by the new city pipe line to empty in the channel, by the flow of which it will be carried into the Atlantic Ocean. The majority opinion of the Circuit Court held this required service in the field of adequate sewerage to be a valuable contribution to this annexation area, and that, in addition, the city's excellent fire and police departments should prove .highly beneficial to both annexation areas.

In support of the county's position that the finding of the majority of the court that it is necessary and expedient for Portsmouth to annex either one or both of the two areas is erroneous, a number of different reasons being advanced.

■ In the first place it is said that the residents and property owners of both annexation areas are vigorously opposed thereto. This is not surprising. A like condition has existed in nearly every effort of a Virginia city to annex suburban areas, begining with *Alexandria* v. *Alexandria County*, 117 Va. 230, 237, 84 S. E. 630, but such opposition has never been held a sufficient ground to deny annexation when the requisite conditions exist. A principal reason for such opposition by residents of proposed annexation areas is the necessity for higher property taxes to support the many additional services in the fields of health, fire, and police protection, garbage collection, lights, streets, sidewalks and sewers, parks and playgrounds, as well as many other facilities incident to the government of a city. While some of these are found in rural governments, they generally are on a much more limited scale as is true in this case. Portsmouth did not undertake to refute the fact that such opposition existed among the residents of Area No. 1. One of its chief expert witnesses, Dr. Thomas H. Reed, a distinguished authority on the subject, was asked whether he was familiar with the system of local government in Virginia, to which he replied:

"Yes, I became interested in that quite early in my studies of metropolitan government, because the system in Virginia is peculiar in two respects.

"In the first place, it makes as nearly as complete separation as could possibly be made between urban and rural local governments, as the cities being divorced from the county in which they are physically located, but to all intents and purposes the cities themselves have provision for annexation which is more rational and more practical in Virginia than anywhere else; that is, annexation in Virginia, as you know, is a court proceeding, in which the Court decides on the basis of the evidence presented as to the necessity and expediency of annexation.

"In most other parts of the country annexations are determined by popular vote of the people who are sought to be annexed; the result has been that generally throughout the country, there are no annexations.

"There has not been any very considerable annexation of territory to an important city in the United States, outside of Texas, where they have, I think, an unduly free system of annexation, because down in Texas a city can annex unincorporated territory by a mere resolution of the City Council, which I think goes altogether too far, but in other parts of the country where it is necessary to have a popular vote of the people who are to be annexed in order to bring about annexation, annexations simply do not occur, and very serious consequences have resulted from that.

"Q. The line of distinction which you have mentioned between cities and counties in Virginia is almost a unique feature?

"A. Yes, it is practically a unique feature."

In 1906, about two years after the enactment of the annexation statute, Code 1942, section 2956 *et seq.*, in *Henrico County* v. *Richmond*, 106 Va. 282, 299, 55 S. E. 683, 117 Am. St. Rep. 1001, this court found that the legislature had established a policy of annexation by municipalities as a public necessity, and since that time said policy

has been consistently adhered to and repeatedly approved by this court. The consolidation of contiguous urban areas under one municipal government, when appropriate conditions exist, has been encouraged. Section 126 of the Constitution imposes upon the General Assembly the mandatory duty of enacting legislation to provide for this, and our annexation statutes were passed in discharge of that duty. This policy with respect to municipal government is further exemplified by statutes providing for the conversion of a town into a city of the second class when its population is found to amount to 5000, and for the conversion of such city to one of the first class when its inhabitants number 10,000. Code of Virginia, sections 2896, 2910. See also, Constitution of Virginia, section 116.

The county vigorously asserts that its government in the annexation area fully meets the needs of the inhabitants and it would be inequitable to impose on them the increased expense of additional governmental services which are wholly unnecessary. But this argument leaves out of consideration the fact that a great many of those residing in the area earn their livelihoods in the city of Portsmouth. While working there, and going to and from their work, they enjoy the use of the streets, the safety due to traffic regulation thereon, and various other facilities, such as fire, police, and health protection, all afforded at the expense of those who pay city taxes. The equitable criterion is not alone the services rendered to the *properties* in the outside areas, but also must include those enjoyed by the *individuals* themselves while at work in the city, or visiting its churches, stores, public library, theaters, civic clubs, and other places of business and recreation. It is not inequitable that they should share in the expense as well as in the enjoyment of these conveniences and advantages furnished by the city. These inhabitants also have the benefit of the stand-by protection of their homes afforded by the city police and fire departments. See *Alexandria* v. *Alexandria County, supra.*

With respect to a like question in *Henrico County* v. *Richmond*, 177 Va. 754, 788, 15 S. E. (2d) 309, Justice Eggleston, speaking for the court, had this to say:

"Moreover, it is no answer to an annexation proceeding to assert that individual residents of the county do not need or desire the governmental services rendered by the city. A county resident may be willing to take a chance on police, fire and health protection, and even tolerate the inadequacy of sewerage, water and garbage service. As long as he lives in an isolated situation his desire for lesser services and cheaper government may be acquiesced in with complacency, but when the movement of population has made him a part of a compact urban community, his individual preferences can no longer be permitted to prevail. It is not so much that *he* needs the city government as it is that the area in which he lives needs it."

The county provided the government for the areas involved for many years, and until their growth and development was in a large measure completed, while the city took no steps to annex them in the early development stages. For this reason, the county apparently considered it to be inequitable for the city now to be permitted to absorb these areas so developed under its government. And the intervening petitioners, in their reply brief, urge that the statute should not be construed "to allow the city to stand by until a positive growth forms on its periphery". This delay in annexation, however, has resulted in no pecuniary loss on the part of the county or the intervening petitioners. The annexation decree requires the city to pay the proportionate part of the county indebtedness attributable to these areas. This indebtedness is represented by loans obtained from the Literary Fund for the construction of eleven schools located outside the annexation areas. The city is further required to pay the county the entire value of the schools and other public buildings and improvements located within the areas. Moreover, the county has benefited from the tax revenues derived from these areas during the

period of growth, which must have been considerable judging from its unwillingness to be deprived of them at this time, while the intervening petitioners have enjoyed the low tax rate of the county and, at the same time, many city advantages. On the other hand, although the delay in annexation has been profitable for the county, it apparently has also been decidedly beneficial to the city for a number of reasons. In the first place, as pointed out in the very able brief of counsel for the county, one of the chief burdens under which a city government labors is the cost of construction and maintenance of its streets. In the counties this expense is borne wholly by the State and the work is done by the State Highway Department. Thus, while the construction and maintenance of the streets in the areas here involved during the period of their growth has cost the county nothing, yet if the city had annexed the areas in their early stages of development, this tremendous cost and burden would have been borne by the city. Now the city receives the areas with the streets constructed, and in good condition free from any cost to it whatever. It is not required to pay the county for the streets the State built and which cost the county nothing. The city is just as much entitled, when it can, to enjoy this benefit of the State's highway policy as the county is.

A second consideration which no doubt influenced the timing of annexation, and properly so, is this: While most cities with reasonable safety may count on an expansion of their territory, it is frequently impossible to foretell in what particular place or section the expansion will occur. A trend in one direction this year may be completely changed by the location of an important new industry either within the city or in the county or a nearby town. In such a case, further development of the prematurely annexed area may be greatly retarded or arrested altogether.

Then again it is an admitted and acknowledged fact by all the parties to this suit that, since the advent of busses, the fast, cheap automobiles, and improved highways, per-

sons moving from the city out to, or new arrivals settling in, the suburban sections, show a decided preference for locations which are beyond the city lines. Naturally, they prefer the lower taxes the county will impose. There was, therefore, involved the risk that such a premature extension of the city line would completely arrest any further development in the new area embraced therein. Such an actual experience was stated in oral argument by counsel for the county when, in referring to the effect of the Portsmouth 1919 annexation, he said: "this annexed area immediately became dead as a dodo". Or to express it differently, a premature annexation might well result in a leap frog form of development for the future city.

Portsmouth owns and operates its own water supply. The annexation of the area before it was reasonably assured that its growth and development would be sufficient to justify a city form of government might have placed on the city the duty of laying expensive water mains as well as sewers to accommodate what would remain for many years as a large number of vacant lots interspersed among those occupied by buildings.

Furthermore, the General Assembly has recognized the wisdom of a city's refraining from premature annexation of insufficiently developed lands. Section 6 of Chapter 415 of the Acts of Assembly of 1938, p. 779 (Michie's Code, section 2880rr), authorizes coperation between the planning commissions of counties and those cities located in their county "with a view to coordinating and integrating the zoning plan of such county" with the plans of any such city or town. There is also the "plat act" (Michie's Code, sections 5222a to 5222gg) which denies to the owner of any suburban development within three miles of a city the size of Portsmouth compensation for improvements made by him in connection therewith unless he files with the appropriate city authorities a plat or plan of said subdivision, same is approved by them, and thereafter admitted to record. The obvious purpose of these statutes is to give the munici-

palities a reasonable voice in the development and improvement of lands which at some future time will probably, or even possibly, be sufficiently developed and occupied by residential or business structures to justify their annexation.

██ We conclude, therefore, that the county and the intervenors have not been injured by the action of the city in exercising its right to delay its annexation proceding until such time as its governing body deemed it wise and propitious, and that the decree is not inequitable on this account.

The county also urges that, since the lands in the areas are already fully occupied and developed, they cannot be annexed because the city can have no need for them "for future development" as required by section 2958 of the Code. The provision contained in said section which the county invokes is as follows:

"* * * The court shall so draw the lines of annexation as to have a reasonably compact body of land, and shall also see that no land shall be taken into said city which is not adapted to city improvements unless necessarily embraced in said compact body of land, or which the city shall not need in the reasonably near future for development. In making its decision as to the character and extent of annexation the court shall take into consideration as well, not only the development of the city, but also the loss of revenue to the county."

██ ██ Portsmouth insists that the word "development" in the statute means not development of the annexed land, but development of the city. We think this interpretation is the correct one and is borne out by the subsequent provision in the last above-quoted sentence of the statute that the court shall take into consideration "the development of the city" in deciding the "character and extent of the annexation". As stated in the city's brief, "Portsmouth here is not invading any rural area whatever. It seeks to annex two areas, one primarily residential and one primarily industrial, and both definitely urban in character". We also concur in the position taken by the city that the Vir-

ginia Constitution and statutes, by providing the different types of government for the counties and cities of the State, have established "the policy of placing urban areas under city government and keeping rural areas under county government".

■ The county further objects to the annexation, on the ground that the evidence does not support the finding that it is necessary and expedient. Section 2958 of the Code provides that "if the majority of the court shall be satisfied of the necessity for *and* expediency of such annexation * * * an order shall be entered providing for the annexation of such territory. But if a majority of the court shall be of opinion that no annexation is necessary *or* expedient, the motion to annex shall be dismissed". Therefore the evidence must sustain the finding of the circuit court that it is both necessary and expedient.

■ It is clear from the maps exhibited to us and from the testimony of many witnesses that, unless the future growth and expansion of Portsmouth are to be almost completely obstructed, the annexation of both areas is necessary. The evidence shows that both are already so closely interwoven into the life, and the business and commercial activities of the city, as to constitute an integral part thereof. The homes and industrial properties in these areas, the evidence shows, have resulted from the city's natural growth and expansion. The people who live and work there constitute an integral part of what O. Henry portrays as "The Voice of the City". To require them, nevertheless, to remain under separate and different types of governmental administration and control would run afoul of the established policy of the State above alluded to that urban areas should be under urban government and rural areas under county government. Such a condition of divided government in one compactly settled urban community would be likely to generate undesirable frictions and controversies among the respective inhabitants.

■ Is the annexation "expedient" within the meaning

of the statute? That is—as we interpret the word—is it advantageous and in furtherance of the aforesaid policy of the State with respect to annexation? The majority opinion below found that the city is not financially unable to undertake the proposed annexation and we find this conclusion supported by the evidence. Therefore, we think it follows from what we have said above that it is expedient.

 Many owners of the industrial establishments, as intervenors, have also united with the county in objecting to the annexation of Area No. 2. They are opposed to being "subject to inspections and regulations that we don't need and don't want", and to "the increase in taxes" from which they say they will derive no benefit. They also contend, as we have indicated above, that the city should have annexed prior to the development of the area. The answer to these two last objections is found in the opinion of this court in *Narrows* v. *Giles County*, 184 Va. 628, 638, 35 S. E. (2d) 808, where Justice Gregory said:

"The right to tax does not depend on the presence or absence of benefits to the property. In a situation such as we have here, it is no answer to say that the railway company will receive no compensating benefits. And furthermore, the railway company is presumed to have known when it built its power plant immediately adjacent to the town of Narrows that it might eventually be exposed to the liability of being taken into the corporation by annexation."

 Nor can we subscribe to the intervenors' views that industrial operations in this Area No. 2 should not be subject to regulation by the city. Some of the present industries may be replaced in the future by others. It may become necessary, in the public interest, to prohibit the creation of excessive quantities of smoke or objectionable or noxious fumes, to regulate traffic on the streets, or take certain precautions against fires and the loss of life therefrom. An industrial area is subject to the danger of disorder from labor disputes, and for other reasons is more in need of police and fire protection than a residential sec-

tion. Such regulatory control of and protection from harmful practices or disorders, if and when they arise, will inure to the benefit of all the industries in the annexed area as well as to the inhabitants of the city generally.

Objection is also made to the annexation of Area No. 2 on the ground that it does not comply with the requirement of section 2958 of the Code, which provides that "The court shall so draw the lines of annexation as to have a reasonably compact body of land, * * *". The annexation decree provides for the inclusion of the Navy Yard within the enlarged boundaries. The county and the intervenors insist that this cannot be annexed as a part of the city in contemplation of law, and that without same the remaining part of Area No. 2 is not a reasonably compact body. They argue, and the dissenting opinion expressed the view, that the reason the city included the Navy Yard in the area was to render compact what otherwise would not be. In the case of *Western Union Tel. Co.* v. *Chiles*, 214 U. S. 274, 29 S. Ct. 613, 53 L. Ed. 994, it was held that the United States possesses exclusive legislative jurisdiction over this Navy Yard.

We think the Navy Yard should, nevertheless, be included in the boundary of the annexation area. Its activities are adjacent to and closely associated with the City of Portsmouth. After the annexation of the remaining part of Area No. 2, the Navy Yard would be completely isolated from any unsubmerged lands of the county. The functions of assessment and collection of income, sales and use taxes which Congress now permits the State to exercise over this Federal area can be performed more conveniently and appropriately through the taxing authorities of the city than those of the county. After such annexation the Navy Yard will occupy the same relation to the city that it now does to the county. This will be the only effect of its inclusion in the area.

This brings us to the consideration of the provision of the statute that "The court shall so draw the lines of an-

nexation as to have a reasonably compact body of land". What constitutes such a "reasonably compact body" necessarily must depend upon the circumstances and conditions of each case. The word "compact" as here used has no clear and precise meaning. A body of land which is not connected with or contiguous to a city boundary would, under most circumstances, be an isolated body, separate and distinct, not joined to the city and, therefore, ordinarily could not be said to be compact in relation to the city. On the other hand, it cannot be said that a compact body must have regular or symmetrical contours, or any particular characteristic or shape. Area No. 2, annexed by the decree of the circuit court (independent of the Navy Yard) contains all of the lands situated in that vicinity lying between the present city and the west pierhead line of the Southern Branch of Elizabeth River along which the boundary has been extended, and all land lying between Paradise Creek and the Navy Yard. Thus, as appears from the maps, said remaining portion of Area No. 2 is bounded by the present city boundary line along the western side of a relatively small portion thereof. The contact with the city line appears from the map to extend about a half a mile. Said remaining portion is bounded by Paradise Creek along its entire south and southwesterly borders; by said Southern Branch along the east side and by the Navy Yard on the north. Situated along the opposite side of Paradise Creek in Norfolk County are several fully developed suburban residential areas, the principal one of which is known as Craddock with a population of several thousand. There are a few highway bridges across Paradise Creek connecting these suburban developments with annexation Area No. 2.

 Counsel for the county contend apparently that the Craddock development is obviously urban; that it lay in the discretion of the city whether to include it in the annexation area; that if it had been included in Area No. 2 the result would have been a compact body of land, even

after the elimination of the Navy Yard from consideration, and that, because the city elected not to include it therein, the remaining part of Area No. 2 should be held to be not a compact body of land and its annexation should be denied. But the statute prescribes no standard or yard stick for determining compactness. There is not other land under the jurisdiction of the State which can be added to said area to render it more compact except by including within the annexation area the large suburb of Craddock, on the opposite side of Paradise Creek. This, the record shows, the City of Portsmouth is financially unable to undertake. Such an enlarged annexation, therefore, cannot be held to be "expedient" as required by the statute if the city is not in a financial condition to undertake it. The circuit court has found the annexation of Area No. 2 both necessary and expedient. We hold this finding to be amply supported by the evidence. The statute therefore requires the court to direct the annexation unless the shape of the area, with its irregular, and in part narrow, contours, forbids. The cardinal purpose of the act is to provide for the expansion of cities to the extent that same is necessary and expedient. The provision with respect to compactness of the area directs the court to so draw the lines as to form a "reasonably" compact body of land. But the court cannot so draw the lines as to result in an inexpedient annexation. The statute does not forbid the annexation of a desirable urban area merely because it is not compact in form anymore than it permits the annexation of a substantial body of rural or agricultural lands in order to render an adjacent urban area compact. The shape of the area, the symmetry, regularity or irregularity of its contours was clearly intended by the statute to be subordinate to the necessity or expediency of its annexation, having in view the interests of the county as well as of the city, and of the residents and freeholders of both. Therefore, since it is impossible for the court in this case to alter the lines in any way that would render the area more compact than it is as directed to

be annexed by the circuit court, without including another area which it is not expedient to annex, we hold that said Area No. 2 is a "reasonably compact" body of land within the intent and meaning of the statute.

Counsel for the county earnestly protest against the policy which, this court has found to have been established by the General Assembly, that urban areas should be under urban government and rural areas under county government. But this policy is just as advantageous to the counties as it is to the cities. It protects the counties from having their rural or agricultural areas annexed by the cities, either for the purpose of making an annexable area more compact, or of conferring upon the cities planning and zoning powers over the rural areas. If it is deemed desirable that the cities possess such powers over neighboring undeveloped or partially developed county lands, the General Assembly can confer the powers upon them. It is not for the courts to do so through the device of annexation.

Objection is made to the terms of annexation because the two disconnected areas are treated as one annexation, but this we think is without merit. After the annexation each one of the areas is as much a part of the city as the other. The practice which has heretofore prevailed in cases of this nature (see *Henrico County* v. *Richmond*, 177 Va. 754, 15 S. E. (2d) 309, where no such disdinction was made) has been to treat all of the areas annexed as though they constituted but one area. We do not see how it would be practicable to adopt any other course. The fact that they are not contiguous seems to us to be immaterial.

The county also insists that the trial court erred in failing to give due consideration to the effect which the loss of revenue resulting from the annexation will have upon the county. The majority opinion, delivered by Judge Crosby, stated its consideration and conclusion with respect to this question, and as we are in accord with same we quote it in full as follows:

"It should be pointed out here that there never was a case where a County was better able to stand annexation than in this case. In the County Audit, the following figures speak for themselves: In 1940-41 the total assessed valuation of Norfolk County was $22,870,000; next year it was $24,311,000; the next year a jump of $4,000,000 to $28,586,000; and the next year it jumped $9,500,000 to $38,103,000; and this last year it jumped $7,000,000 to $45,-781,000. The tax effect upon Norfolk County in granting this annexation is less than the jump which Norfolk County had in the single year of 1943-44 to 1944-45. A very great part of these phenomenal increases arose from the tremendous housing which has been put in this very area—a large part of which is in proposed annexation Area No. 1. Taking a long-range view of the situation, the County's loss will be very small."

The decree appealed from is

*Affirmed.*