THE STATE OF NEVADA Upon the Relation of W. T. MATHEWS, Attorney General of the State of Nevada, SONYA S. HOLLAND, FRANCES and GENE F. LaTOURRETTE, Wife and Husband, JANE B. and JOHN L. STADTLER, Wife and Husband, PHYLLIS and CLEVELAND B. CRUDGINGTON, Wife and Husband, SUSAN S. HANCOCK, a Single Woman, ANTHONY L. STADTHERR, PATRICIA S. KENDALL, a Single Woman, ABRAHAM LINCOLN KENDALL, ELLA and WILLIAM EDWARDS, Wife and Husband, JULIA C. JUDGE, M. O. LITTLE, and INTERLAKEN PARK CORPORATION, a Nevada Corporation, Relators, v. CITY OF RENO, a Municipal Corporation, FRANCIS R. SMITH, Mayor, and WILLIAM A. LIGON, EDWIN SEMENZA, CHARLES E. COWEN, THOMAS HARVEY, JOHN T. MYLES, and MARSHALL A. GUISTI, Councilmen of said City, Respondents.

No. 3758

June 28, 1955. 285 P.2d 551.

See also 70 Nev. 167, 262 P.2d 953.
(Rehearing denied, August 26, 1955.)

*Clyde D. Souter,* Reno, for Relators.

*Samuel B. Francovich* and *Bruce D. Roberts,* Reno,
for Respondents.

## OPINION

By the Court, BADT, J.:

The state, upon the relation of the named relators, to
whom the attorney general was added by an earlier
order of this court, filed its complaint and information
in the nature of a quo warranto, praying that respond-
ents be ousted and excluded from the lands of relators

and barred from using or enjoying any rights, privileges or corporate powers of the City of Reno upon or concerning said lands. In particular the complaint attacked the legality of an ordinance annexing the lands in question. On November 5, 1953 we denied a motion to dismiss the proceedings, 70 Nev. 167, 262 P.2d 953, and on March 22, 1954 we made an order of reference to Honorable John S. Belford, judge of department 1, Second judicial district, Washoe County, to take evidence upon the issues made by the pleadings and to certify the same to this court. Upon the issues made by the pleadings and the oral and documentary evidence submitted in such record, the matter was then submitted to this court upon elaborate written briefs and oral argument. The result of the intensive preparation and earnest presentation of the legal and factual issues involved is our concentration upon two grounds upon which the validity of the annexation ordinance is assailed, (1) that the annexation cannot be justified upon the ground that it was warranted by the normal growth and expansion of the city, and (2) that its sole purpose was to construct a sewer which would be of no benefit to the annexed property. As against both of these assaults, we have concluded that the validity of the annexation must be sustained.

1.   Consideration of the physical aspects of the case leads to a conclusion that the respondent city, its mayor and board of councilmen were justified in their determination that the normal growth and expansion of the city warranted the annexation of this contiguous property. The property consisted of parcels indicated on maps in evidence as parcels one, two and three. These three parcels, together with three additional parcels known as the Souter property, the Mongolo property and the Springmeyer property, constituted an "island" surrounded on all sides by the city proper. Elimination from the annexation proceedings of the Souter, Mongolo and Springmeyer properties left those three portions of

the "island" still unannexed. The Souter property, comprising some six and one half acres, was said to have been eliminated from the proposed annexation by mistake or inadvertence. Whether or not this was so does not affect our conclusions. The Mongolo property, involving about 14 acres, and the Springmeyer property, comprising about 6 acres, were purposely omitted by the city from the annexation proceedings because it was considered that those two parcels were agricultural in nature and exempt from annexation without the consent of the owners under the ruling of this court in State ex rel. Bibb v. City of Reno, 64 Nev. 127, 178 P.2d 366. The elimination of these three portions of the "island" (at least until some future time when their annexation may appear to be justified) is, in the first instance, a legislative question and presents no reason in law why the remaining part of the "island" may not be presently annexed if the conditions justify.

Parcel one along its entire western boundary is contiguous to the city. On the easterly side of parcel one (separated by Arlington Avenue, a street included in the annexation) parcels two and three are contiguous to the city though not to each other, as they are separated by the Mongolo parcel. Parcel two in turn is contiguous on the north and east, and parcel three is contiguous on the south and east to the city proper. On the north, parcel one is contiguous in part and on the south it is contiguous in part to the city proper. So we do have a situation in which the three parcels annexed are virtually surrounded by the city. The physical aspects must be considered further. Parcel one is divided into two parts by Plumb Lane, which runs in an easterly and westerly direction approximately through the center of the entire parcel. It leaves two tracts, each of which is fairly rectangular in shape, and the northerly part of which has been subdivided into building lots and is known as Interlaken Park. Parcels two and three are somewhat irregular in shape, and each is approximately one sixth to one eighth the size

of parcel one. Relators consider it significant that the building lots in Interlaken Park vary in size from approximately one half acre to approximately one and one half acres, and are considerably larger than the normal city building lots; that a series of artificial lakes extends easterly and westerly through the approximate center of Interlaken Park; that five residences have been constructed on five of these lots, respectively, and that the investments in these five lots and buildings range from $20,000 to $65,000; that under the restrictive agreements under which these lots were purchased the lots all have access to the lakes, rights of way have been conceded to the owners of the various lots and various building restrictions have been agreed to; that the residences already constructed, the eight or ten additional lots sold in contemplation of further residential construction, the natural beauty and location of the terrain, as well as the express purpose of the owners in choosing these lots for building sites, all point to the selection and creation of Interlaken Park as "a place of beautiful suburban living," to which purpose the area as a whole is definitely dedicated. To illustrate this the relators introduced in evidence sundry photographs of the lakes and of the five residences there. They point out that there has been no dedication to public use of the access rights of way. They point to their planting of trees, shrubbery and gardens as further proof of the dedication of this property "to beautiful suburban living." They do not want to become part of the City of Reno; they want to be let alone.[2]

But the history of the growth of the cities of this country is replete with situations of this kind. Suburban portions of a city, remote from the center of trade and population, devoted largely to residences more or less

---

[2]Relators include owners of parcels involved in the annexation not within the area of Interlaken Park. Such parcels, as well as the lots in Interlaken Park, have been duly considered in our conclusions. If it would appear that our discussion has in the main dealt with the lots in Interlaken Park itself, it is because the main contentions advanced in this proceeding come from that area.

scattered and occupying larger parcels of ground than those in the central portions, find themselves engulfed within the growth of the city and geographically a part of it. Reluctance to become a part of the municipal organization is understandable, but the march of time and change is inexorable. The Supreme Court of Virginia, in permitting annexation in the face of objection, remarked that such objection is not surprising: "A like condition has existed in nearly every effort of a Virginia city to annex suburban areas * * *." Norfolk County v. City of Portsmouth, 186 Va. 1032, 45 S.E.2d 136, 138. In the instant case Interlaken Park was subdivided into lots for sale. The original plat subdivided the park into twenty lots. An amended plat effected a further subdivision into a total of thirty-three lots. Nine lots of an approximate half acre each front on Plumb Lane along the southerly line of the subdivision and four similar size lots front on the northerly line of the subdivision. The larger lots for the most part form two tiers through the center of the subdivision, in addition to lots fronting on the extreme easterly and extreme westerly boundaries. The entrance to the park is through a gateway fronting on Arlington Avenue, a main avenue of approach to the city proper from the south. Signs posted near this entrance read: "Beautiful Interlaken Park. Lots for sale. Choicest homesites." Restrictions binding on lot purchasers restrict the use to residential purposes only and prohibit use for businesses, trades or professions. The general purpose as recited is "to develop a beautiful, pleasant and desirable residential district." Nothing in the foregoing picture or in other descriptive matter appearing in the record or in the photographs indicates that the beauties or ideals of suburban living will suffer by the annexation.

2. But relators contend that the sole purpose of the annexation is to subject the annexed territory covered by the ordinance, including the properties of the relators, to the payment of the expense of bringing a sewer to the parcel known as Country Club Heights and the thirty

homes thereon, although neither the relators nor their property "would benefit in the slightest degree from a sewer so constructed." It is asserted that the mayor and board of supervisors frankly admitted that such was the purpose of the annexation.

Country Club Heights is a small rectangular tract in the southerly half of parcel one, with its north boundary fronting on Plumb Lane, and extending south approximately to the center of the southerly half of parcel one. East-west wise it is centered in the northerly boundary of the south half of parcel one. Its access is by way of Hoyt Drive and Phillips Drive, running south from and at right angles to Plumb Lane and these two drives are connected by Lampson Lane, an east-west lane along its southerly boundary. In the area thus bounded are thirty occupied homes. This is the tract and these are the homes from which came the petition for annexation. Country Club Heights by itself, was not contiguous at any point to the City of Reno prior to the annexation.

Country Club Heights, lying thus almost in the exact center of the entire parcel one, is badly in need of sewerage. It has petitioned for annexation. It would be served by a sewer extending westerly along Plumb Lane from a point on Plumas Street, which is the next street paralleling Arlington Avenue, on the east. Such sewer would also provide immediate sewer access to five lots of Interlaken Park—those lots in the southeast corner thereof whose southerly boundaries front on the north line of Plumb Lane. Of the five residences already constructed in Interlaken Park, two (the Crudgington residence and the Rowley residence) are presently enjoying sewer service by connection with another City of Reno sewer. As to the remaining lots in Interlaken Park, relators complain that it may be many years before the sewer service may be available and then at great expense; that presently they are satisfactorily served by septic tanks approved by the health authorities. They say that despite this, the City of Reno contemplates

assessing them for that part of the sewer to be constructed primarily to serve the thirty residences in Country Club Heights. The record does indeed indicate that this is precisely what the board has in mind. But we are not here concerned with the legality of some future assessment, or the lawfulness of assessing some particular parcels for some particular improvement from which they may or may not benefit. The city charter contains ample provisions for notice, objections and hearing, both with reference to the adoption of ordinances for special assessment sewer construction and with reference to the levying of such special assessments in accordance with frontage, benefits, etc. Reno Charter, Art. XII, secs. 10.15 et seq., Stats. 1945, p. 408, et seq., 1953, p. 219. That situation has not yet arisen. Our only concern is whether the ordinance effecting the annexation is, within the ruling in Bibb v. City of Reno, so arbitrary, unreasonable, unjust and unnecessary as to render it invalid.

Mr. Ligon, acting mayor of the city, when asked what consideration was given in determining the propriety of annexing the Interlaken area, testified: "There were several considerations. We considered the fact that there was a possibility, according to Judge Souter's plea, that it might be termed as agricultural land, and I determined in my mind that it was not agricultural land. The consideration of the sewerage was the most important for the people in the area. Many of the people, and particularly south of the area, were in dire straits as far as sewerage was concerned, and are at the present time. The other considerations were that we didn't feel that we should leave another island in the City of Reno where they had nothing but county property, and that our annexation should be, by all means contiguous, and make that an integral part of the city and not be just an island there." He testified that the reason the Mongolo and Springmeyer properties were not included in the annexation, though contiguous properties, was because of the supposed effect of the decision of this court in the

Bibb case with reference to agricultural land; that subjecting the Interlaken Park property to sewer construction cost, though one of the most important reasons for the annexation, was not the compelling reason; that the compelling reason was the other above given; that in annexing Interlaken Park the council gave thought to seweraging the entire area; that it would not have been fair to annex only a part of that area, yet to bring the sewer mains into the other area not annexed, and that this was a consideration for the annexation; that rough plans had been drafted for extending the sewer to the other parts of the Interlaken area.

The city engineer testified that a firm of engineers on behalf of the city had conducted a survey to determine the feasibility of sewering the area and that a report on such feasibility had been made. This plan showed a spur north on Arlington Avenue, north of Plumb Lane to a point which would be used as the entrance point for the laterals that would then be run into Interlaken Park area. The report advised that there were no dedicated streets in Interlaken Park and that some form of easement to put in the sewer system would be required; that the tentative survey indicated a sewer on the north side of the lakes and one on the south side, running generally easterly and westerly and sloping generally easterly toward Arlington Avenue.

Raymond M. Smith, the director of planning employed by the city and county planning commission, testified concerning what was known as the Freedom area, which includes Interlaken Park. He had had a number of meetings also with the state planning board. That board's recommendation was that the city annex the entire so-called Freedom area but this was subject to any of the restrictions imposed by this court in the Bibb case. This involved meetings also with the regional planning commission. Smith testified: "The planning commission in arriving at their decision gave consideration to such facts as the administration of an efficient and economic unit. That is the point that the Freedom area,

existing as an island, tended to create an inefficient economic unit, as far as both the city and county were concerned. They gave attention to the problem of a very definitely growing sewerage and drainage difficulty, observing that the county had been talking sewer and drainage solutions in the area, as well as other areas, for many years, without any appreciable progress. They gave attention to the problem * * * of protecting the city areas surrounding it, that is, the Freedom area exists as an island and sort of a vacuum, not subject to the regulations concerning development and construction that the surrounding city areas were subject to. Incidentally, along that line we had received a petition over a year or so before that requesting a county building code, which was signed by quite a few resident owners in both jurisdictions, and they gave also consideration to the proper development of community facilities, particularly a street and highway progress, and which both through the acquisition of rights of way, and through paving assessment programs it would be necessary to have one administration unit."

The restrictive covenants of Interlaken Park contained the provision: "Until sewage disposal is provided for by a municipal corporation, all sewage disposal shall be by septic tanks * * *. When sewers are municipally supplied, they must be made use of within a reasonable time, and septic tanks discontinue."

This then is the picture presented under which we are asked to set aside the annexation ordinance, first, because it "is arbitrary, unreasonable, unjust and unnecessary," Bibb v. City of Reno, supra, [64 Nev. 127, 178 P.2d 368] and, secondly, because the annexation is said to be for the sole purpose of assessing the lands of the relators to pay the costs of a sewer which they cannot presently use and may not be able to use for many years. Relators concede frankly that the only purpose for the citation of the Bibb case is for its rule that the city's right to annex property is not an absolute one, as the Bibb case dealt entirely with attempted

annexation of agricultural property under the circumstances there described. The opinion in the Bibb case cited many Missouri cases, as the supreme court of that state dealt with many annexation problems growing out of its rapidly growing cities. Such Missouri cases were decided both prior and subsequently to State ex inf. Major, Attorney General v. Kansas City, 233 Mo. 162, 134 S.W. 1007, which in turn referred to the rule laid down in Vestal v. Little Rock, 54 Ark. 321, 329, 15 S.W. 891, 16 S.W. 291, 11 L.R.A. 778, that from all of the authorities gathered up to that date the correct rule to guide in annexation cases, and which is still cited in 2 McQuillin, Municipal Corporations, 3d Ed., sec. 7.18, as proper, is that contiguous lands may be annexed "(1) when they are platted and held for sale or use as town lots; (2) whether platted or not, if they are held to be brought on the market and sold as town property when they reach a value corresponding with the views of the owner; (3) when they furnish the abode for a densely settled community, or represent the actual growth of the town beyond its legal boundary; (4) when they are needed for any proper town purpose, as for the extension of its streets, or sewer, gas or water system, or to supply places for the abode or business of its residents, or for the extension of needed police regulation; and (5) when they are valuable by reason of their adaptability for prospective town uses; * * *." In the Kansas City case the supreme court adopted the report of the commissioner as ably and fairly reviewing the issue of the reasonableness of the annexation and properly supporting his conclusions by the authorities cited by him. As did this court in the Bibb case, it considered whether the annexation was so unreasonable that it should not be allowed to stand, but concluded that it was no province of the court to substitute its own judgment of what would be the best or most advisable line for the proposed extended limits of the city. As in the instant case it was found that a pressing necessity existed for the installation of a sewer system which would take care of the

sewerage in one section of the territory annexed. As in the case here, the value of part of the land annexed depended entirely upon its use "for high class suburban homes." As here, it was necessary to look to the future rather than the immediate present use of the property. The difficulty of determining whether annexation was justified because of the normal growth of the city was recognized. "None of the decisions define what is meant by 'growth,' or how far into the future the city may look." With reference to the objection that the inclusion of the lands of the relators would subject the same to city taxes, both special and general, it was aptly stated: "Special taxes are in the law's eye for direct benefits. City taxes for general purposes do not constitute a violation of * * * constitutional provisions * * *." Kelly v. Pittsburg, 104 U.S. 78, 26 L.Ed. 658.

Feeling as we do, that in considering whether the annexation ordinance is so unreasonable that it constitutes a taking of property for public use without just compensation or that it is lacking in due process or that it deprives the relators of the equal benefit of the laws we should not approach the problem in a narrow or restricted view of the needs of the city or of the property itself, but broadly and in a manner commensurate with the history of Reno's growth, its present necessities and its promise of future development, we cannot feel that we should be justified in vacating the ordinance. In the last analysis, to do this, we should be substituting our own judgment in a matter which is largely one of legislative discretion. 62 C.J.S. 130, Municipal Corporations, sec. 46.

The direct question dealing with special taxes levied against relators' property on a frontage or a direct benefit basis is not before us. Although relators complain that the proposed sewer extension contemplated by respondents will be an elaborate and expensive one and without benefit to their property, it is apparent that sewer extension plans are still in a formative state.

What remedies, if any, relators may have if their constitutional rights are threatened by future frontage or benefit assessments to defray sewer cost construction, we do not consider to be properly before us in this proceeding in quo warranto in which there is assailed the validity of the annexation ordinance and nothing more. State ex rel. Mining Co. v. City of Carterville (Mo. App.), 183 S.W. 1093, 1095.

The judgment of ouster sought by the complaint is denied, and it is ordered that judgment be entered in favor of respondents, together with their costs.

MERRILL, C. J., and EATHER, J., concur.